IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| K.C. HOPPS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 4:20-CV-437 |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CINCINNATI INSURANCE COMPANY, | ) ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT THE CINCINNATI INSURANCE COMPANY'S *MOTIONS IN LIMINE***

*MOTION IN LIMINE* **#1** **TO PRECLUDE PLAINTIFF FROM OFFERING TESTIMONY OR EVIDENCE SUGGESTING THAT IT SUSTAINED AN ACTUAL LOSS OF BUSINESS INCOME IN CONNECTION WITH THE EVENTS AT ISSUE IN THE LAWSUIT.**

**A.    Statement of Facts.[1]**

The Policy's Business Income coverage provides in pertinent part, "We will pay for the *actual* loss of 'Business Income' and 'Rental Value' you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'." (Dkt. No. 99-1 at CIC005126, CIC005128-5129) (emphasis added).[2] Likewise, the Policy's Civil Authority coverage promises to pay for the "*actual* loss of 'Business Income' and necessary Extra Expense" Plaintiff sustains in the event of a Covered Cause of Loss that meets each of the additional requirements for Civil Authority coverage. (*Id.*) (emphasis added).[3] The Policy defines "Business Income" in pertinent part to mean:

---

[1] The following Statement of Facts and Argument are offered in support of each of Cincinnati's *Motions in Limine* Nos. 1 through 5. For brevity, Cincinnati incorporates the facts and arguments by reference in each of those Motions.
[2] Dkt. No. 99-1 is a certified copy of the property insurance policy Cincinnati issued to K.C. Hopps ("the Policy"), which was attached as Exhibit 1 to the Declaration of Chad Dowdy (Dkt. No. 99), submitted in support of Cincinnati's pending Motion for Summary Judgment (Dkt. No. 97).
[3] There are other necessary elements for coverage under the Policy's Business Income, Extra Expense, and Civil Authority coverages including, among other things, direct physical loss or damage to property. (Dkt. No. 99-1 at CIC005115, CIC005126, CIC005128-5129 & CIC005148).

1

"Net Income (net profit or loss before income taxes) that would have been earned or incurred" in the absence of a Covered Cause of Loss. (Dkt. No. 99-1 at CIC005148). Thus, the Policy's Business Income, Extra Expense, and Civil Authority coverages do not apply unless there is, in the first instance, an ***actual*** loss of ***Net Income***.

That did not happen here. Instead, Plaintiff, its accountants, and Plaintiff's damages expert testified that Plaintiff's damages claim does not account for the proceeds Plaintiff received from government programs. Those proceeds ***actually*** <u>***exceeded***</u> its claimed financial losses. Indeed, all of the following facts are undisputed:

- Plaintiff retained Kevin M. Grudzien, the Managing Director of Pyxis Group, LLC, a forensic accounting and consulting firm, to provide opinion testimony "to establish the financial performance of a business, absent a loss incident." (Dkt. No. 100, Hammett Decl., ¶ 9, Ex. 8 at Ex. 1, Grudzien Report, pp. 2-3; Dkt. No. 113-1, p. 104, ¶ 46).[4]
- Plaintiff has claimed coverage under the policy for nine of its Insured Locations. (Doc. 51, ¶ 58; Dkt. No. 99-1, Policy, at CIC005073-5074; Dkt. No. 113-1, p. 28, ¶ 9).
- Grudzien opined that Plaintiff suffered business interruption losses totaling $1,727,739 as a result of COVID-19. (Dkt. No. 100, Ex. 8 at p. 4; Dkt. No. 113-1, pp. 104, ¶ 46(a) – (b)). These losses were calculated using the nine restaurants, catering, and food service locations in the Kansas City Metropolitan area that Plaintiff owns and operates and for which it made a claim, and a time period ending December 31, 2020. (*Id.*).
- Plaintiff applied for and received a "first round" of loans in April 2020 from the Small Business Administration's (SBA) Paycheck Protection Program ("PPP loans") in a total amount of $1,823,132. On or about May 3, 2021, Plaintiff received notice of PPP loan forgiveness for the entire $1,823,132 principal amount of those loans, as well as related accrued interest. (Dkt. No. 100, Ex. 2, pp. 168:17 - 172:18, Ex. 15; Dkt. No. 113-1 at pp. 56-57, ¶ 36(r)).
- In and around February 2021, Plaintiff applied for and received a "second round" of PPP loans, for which it also intends to seek forgiveness. (Dkt No. 100., Ex. 2, pp. 172:19 – 173:18, Exs. 13-14; Dkt. No. 113-1 at p. 57, ¶ 36(s)).[5] Based on information received from Plaintiff, the total amount of funds requested as part of the "second round" of PPP loans is nearly $2.5 million dollars. ("KC Hopps, Ltd & Subsidiaries CARES Act & Other Funding Sources").
- Plaintiff will request[ed], and expects to receive, forgiveness of the second round of PPP loans. (Dkt. No. 100., Ex. 3, pp. 114:5 – 114:10, 113:17 – 114:3, 115:24 – 116:14; Dkt. No. 113-1 at p. 65, ¶ 37(i)).

---

[4] Citations to Dkt. No. 113-1 show that the stated fact is uncontroverted.

[5] As discussed below, at the time of Nelson's deposition, Plaintiff had not yet applied for forgiveness of the second round of PPP loans. Plaintiff has not supplemented its written discovery responses on this issue. However, it is Cincinnati's understanding that as of the date of this Motion, Plaintiff applied for and received forgiveness of these loans. (*See* Dkt. No. 108 at pp. 33-34).

- Plaintiff used the proceeds from the first round of PPP loans for 2020 payroll, rent, and utilities pursuant to the "rules" of the PPP loan program. (Dkt. No. 100, Ex. 2, pp. 173:20–174:2; Dkt. No. 113-1 at p. 57, ¶ 36(t)).
- Loans are booked as income if they do not need to be paid back. Loans that are forgiven are booked as a liability until they are forgiven. Once the loan is forgiven, it is shown as income in the year received. (Dkt. No. 100., Ex. 3, pp. 47:14 – 48:23; Dkt. No. 113-1 at pp. 63-64, ¶ 37(e)).
- Plaintiff's restaurants also received grants from the States of Missouri and Kansas, and Johnson County, Kansas depending on the location of the individual Premises. These grants ranged from $10,000 to $20,000 and do not need to be repaid. (Dkt. No. 100, Ex. 3, pp. 107:19 – 108:2, 194:21 – 197:3; Dkt. No. 113-1 at p. 65, ¶ 37(i)). They total nearly $200,000. ("KC Hopps, Ltd & Subsidiaries CARES Act & Other Funding Sources").
- Grudzien did not consider either the PPP loans or the grants in his calculation of Plaintiff's alleged financial losses. (Hammett Decl., Ex. 8, pp. 67:2 – 69:5 & "KC Hopps, Ltd & Subsidiaries CARES Act & Other Funding Sources"; Dkt. No. 113-1 at p. 108, ¶ 47(f)).
- Grudzien has not supplemented his report to address any alleged losses after December 2020, or any alleged losses in excess of those identified in his March 29, 2021 report. Plaintiff has not supplemented its discovery responses to assert any additional losses.
- The deadline for all lay and expert witness discovery has passed. (Dkt. Nos. 39, 55-56).

The above undisputed facts show that Plaintiff sustained no actual loss of Business Income as a result of the COVID-19 pandemic and related orders, as described in the Amended Complaint. As such, Plaintiff fails to satisfy the necessary prerequisites for coverage, ***even if there was direct physical loss or damage to its property***, which there was not.

**B.      Argument.**

Missouri law, and the law nationally, is clear: "The purpose of business interruption insurance is 'to protect the prospective earnings of the insured business ***only to the extent that they would have been earned if no interruption had occurred***[.]'" *Associated Photographers, Inc. v. Aetna Cas. & Sur. Co.*, 677 F.2d 1251, 1253 (8th Cir. 1982) (Missouri law) (emphasis added), *quoting Nat'l Union Fire Ins. Co. of Pittsburgh v. Anderson-Prichard Oil Corp.*, 141 F.2d 443, 445 (10th Cir. 1944) ("The purpose, scope and legal effect of the insurance contract is to protect the prospective earnings of the insured business only to the extent that they would have been earned if no interruption had occurred . . . . In other words, the policy is designed to do for the insured in

3

Case 4:20-cv-00437-SRB   Document 134   Filed 09/13/21   Page 3 of 14

the event of business interruption caused by [a Covered Cause of Loss], just what the business itself would have done if no interruption had occurred— **no more**." *Id*. (emphasis added). *And see, e.g.*, *Nw. States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531, 534 (8th Cir. 1966) ("Plaintiff's present contention, if successful, would do more than make it whole for the loss actually sustained as a result of the business interruption. . . . ***[T]he insured having suffered no loss of sales or earnings as a result of the shutdown would be in a better position than if no shutdown had occurred. We do not believe such a result was intended or provided for in the insurance contract.***") (Iowa law) (emphasis added).[6]

Indeed, several district courts have applied this principle under analogous situations. For instance, *Boardwalk Apartments, L.C. v. State Auto Prop. & Cas. Ins. Co.*, 11 F. Supp. 3d 1062, 1091 (D. Kan. 2014), *rev'd and remanded on other grounds*, 816 F.3d 1284 (10th Cir. 2016), concerned a claim for business interruption coverage following a fire at an apartment complex that completely destroyed one building, and damaged another. *Id*. at 1072. State Auto advanced payment in an amount of approximately $2,000,000 for the destroyed building under the property policy of insurance it issued Boardwalk. *Id*. at 1073. However, Boardwalk did not use the funds to immediately rebuild. Instead, it invested the funds to generate a return. *Id*.

The property insurance policy at issue in *Boardwalk Apartments* was materially identical to the Policy here, and contained the same definition of "Business Income". *Id*. at 1071-1072. On summary judgment, State Auto argued that it was entitled to judgment as a matter of law that "under the Policy, the proper method for calculating Boardwalk's business income benefits is net income that should have been earned during the period of restoration, plus continuing normal

---

[6] *Accord, Supermarkets Operating Co. v. Arkwright Mut. Ins. Co.,* 257 F. Supp. 273, 277 (E.D. Pa. 1966) (same); *Dictiomatic, Inc. v. U.S. Fid. & Guar. Co.*, 958 F. Supp. 594, 603 (S.D. Fla. 1997) ("Business interruption insurance is intended to return to the insured's business the amount of profit it would have earned had there been no interruption of the business").

4

operating expenses actually incurred during the period of restoration, *__minus gross profits actually earned during the period of restoration__*." *Id.* at 1090 (emphasis added). Boardwalk disputed that gross profits from State Auto's payment (*i.e.*, interest income on the investment of the insurance proceeds previously paid) should reduce such benefits. *Id.*

Then-Kansas District Judge Robinson, now Chief Judge of the U.S. District Court for the District of Kansas, held on summary judgment that Boardwalk was required to "back out" from its lost business income calculation interest income it received when it invested the sums it received from State Auto, as long as those funds were available to pay its operating expenses:

> The Court agrees that the Policy language allowing Boardwalk to recover for "actual loss" of "business income" means that it must back out from the loss any interest income Boardwalk earned during the period of restoration that was available to pay Boardwalk's expenses. The case law establishes that under similarly worded policies, "[a] claimant shows "*actual loss*" where the net profits of its business prior to the loss are greater than the net profits of its business after the loss."[ ] The rationale behind these decisions is that a business income loss policy "is designed to do for the insured in the event of business interruption ... just what the business itself would have done if no interruption had occurred."[ ] ***It is not designed to put the insured in a better position than it would have been without the interruption.*** [ ] Allowing Boardwalk to profit from the advance payment from State Auto, as well as recover its net income and operating expenses, would give Boardwalk a windfall rather than compensate for its "actual loss" dictated by the Policy language.

*Id.* at 1091 (internal citations omitted) (emphasis added).

Plaintiff here admits not only that the funds it received via government emergency COVID-relief programs *were* available to pay its ongoing expenses, but that *it was required to*, and, in fact *did*, use the funds to pay those expenses, including payroll. (Dkt. No. 100, Hammett Decl., Ex. 2, Nelson Trans., pp. 173:20– 174:2; Dkt. No. 113-1 at ¶ 36(t)). Additionally, Plaintiff admits that the amount of pandemic relief funds it received actually *exceeds* its ostensible loss, and, that it will *never* be required to repay these government-provided funds. (Dkt. No. 100, Ex. 2, pp. 168:17 - 172:18, Ex. 15; Dkt. No. 113-1 at pp. 56-57, ¶ 36(r)).

5

Other courts have refused to allow insureds to secure a windfall by ignoring earned/received income and revenue. For instance, *Polymer Plastics Corp. v. Hartford Cas. Ins. Co.*, 2006 WL 8429774 (D. Nev. Sept. 26, 2006), *order clarified*, 2006 WL 8429765 (D. Nev. Nov. 14, 2006), *and aff'd*, 389 F. App'x 703 (9th Cir. 2010), concerned a claim for business interruption coverage where a storm damaged the insured's production facilities. *Id.* at *1. Polymer completely suspended operations for a short time, after which it was able to resume partial operations. *Id.*

Like *Boardwalk Apartments*, the property insurance policy at issue in *Polymer* contained the same operative language as Plaintiff's Policy here. *Id.* at *4. The parties disputed the proper method for calculating Polymer's "actual loss" of business income, in light of its partial resumption of operations. Like Judge Robinson, the district court in *Polymer*, applying the policy's plain and unambiguous language, found that "the appropriate formula for 'actual loss of business income' under the contract is: net income that should have been earned or incurred plus continuing normal operating expenses (including payroll) minus ***gross profits actually earned***." *Id.* at *6 (emphasis added). The Ninth Circuit affirmed the district court's decision on appeal. *Polymer Plastics Corp. v. Hartford Cas. Ins. Co.*, 389 F. App'x 703, 705 (9th Cir. 2010). In doing so, the Ninth Circuit explained:

> The district court's formulation of the Policy achieves the purpose of the insurance provision in the first place, and most closely conforms to the actual text of the Policy itself. The essential purpose of business interruption insurance is to place the insured in the position it would have occupied if the interruption had not occurred. *Business Protection or Interruption Insurance,* 46 C.J.S. § 1531. Polymer's formulation ignores the term "*actual* loss of business income" by refusing to take into consideration the gross profits earned during the period of restoration. The Policy as a whole demonstrates an agreement to pay for actual losses, and not for any recovery above that amount. Adopting Polymer's interpretation would ignore the term "actual loss" as well as the other provisions of the Policy that limit coverage to losses actually suffered. . . .

6

*Id*. at 705 (9th Cir. 2010) (emphasis in original).

The U.S. District Court for the Eastern District of Pennsylvania reached the same conclusion in *Eidelman v. State Farm Fire & Cas. Co.*, 2011 WL 198501 (E.D. Pa. Jan. 19, 2011). There, a fire destroyed the interior of Eidelman's law office, along with most of its contents. Eidelman leased a temporary office space, which allowed it to continue operations, albeit at a reduced level. Eidelman sought business interruption coverage for the full amount of its anticipated net income absent the fire, without regard to the actual revenues it generated while operating out of the temporary space. The district court granted State Farm's motion for judgment on the pleadings finding, in pertinent part, that Eidelman's "entitlement to actual loss includes actual loss of business income and actual loss of operating expenses-***meaning, any amounts plaintiffs earned during the period of restoration have to be offset from losses.***" (Emphasis added). The district court again emphasized that property insurance policies like Eidelman's and like Plaintiff's Policy here are intended to restore the insured to the position it would have been absent a Covered Cause of Loss—not a better one:

> As best I can construe plaintiffs' complaint, they seek an order from this Court that they are to receive full coverage for business losses, including the salaries of their attorneys, as if they have ceased doing business entirely since the fire. This is despite the fact that they have leased an alternative location for their business and are operating out of that location until they resume normal business operations at 1248 Hamilton Street. To accept this interpretation would nullify both the clear intent of the policy, which requires them to mitigate their losses and to demonstrate business loss with relevant evidence, and the broader purpose of business interruption insurance, which is to ensure that insured claimants receive the benefits their business would have imparted absent the interruption; not to put them in a better position than they would have been absent the interruption.

*Id.* at *5.[7]

---

[7] Again, unlike the insureds in *Boardwalk Apartments*, *Polymer*, and *Eidleman*, the Plaintiff here failed to show that the virus or the Orders caused direct physical loss or direct physical damage to any property. However, even if they had, the undisputed evidence shows Plaintiff received more in pandemic relief funds than its alleged loss of business income. As such, there is no actual loss of business income, and therefore, no coverage.

Plaintiff cannot show an actual loss of business income as required to satisfy the Insuring Agreements of the Policy's Business Income, Extra Expense, and Civil Authority coverages. (Dkt. No. 98, p. 19; Dkt. No. 113, pp. 16-18).

**WHEREFORE,** Cincinnati respectfully requests this Court enter an order precluding Plaintiff from offering testimony or evidence suggesting that it sustained an actual loss of business income in connection with the events at issue in the Lawsuit.

*MOTION IN LIMINE #***2** **FOR AN ORDER INSTRUCTING THE JURY THAT THE GROSS AMOUNT OF FORGIVEN PPP LOANS, AND OTHER RELIEF FUNDS NOT SUBJECT TO REPAYMENT OR A RIGHT OF REIMBURSEMENT/SUBROGATION, MUST BE DEDUCTED FROM ANY CALCULATION CONCERNING THE AMOUNT OF PLAINTIFF'S ALLEGED ACTUAL LOSS OF BUSINESS INCOME.**

Cincinnati incorporates by reference the Statement of Facts and Argument set forth in support of Motion in Limine No. 1, above.

**WHEREAS**, Cincinnati respectfully requests this Court enter an order instructing the jury that the gross amount of forgiven PPP loans, and other relief funds not subject to repayment or a right of reimbursement/subrogation, must be deducted from any calculation concerning the amount of plaintiff's alleged actual loss of business income.

*MOTION IN LIMINE #***3** **FOR AN ORDER PRECLUDING PLAINTIFF FROM OFFERING EVIDENCE OR ARGUMENT THAT IT SUSTAINED ANY LOSS OF BUSINESS INCOME IN EXCESS OF $1,727,739, THE AMOUNT DETERMINED BY PLAINTIFF'S RETAINED EXPERT.**

Cincinnati incorporates by reference the Statement of Facts and Argument set forth in support of Motion in Limine No. 1, above.

**WHEREAS**, Cincinnati respectfully requests this Court enter an order precluding plaintiff from offering evidence or argument that it sustained any loss of business income in excess of $1,727,739, the amount determined by plaintiff's retained expert.

***MOTION IN LIMINE* #4** **FOR AN ORDER PRECLUDING PLAINTIFF FROM OFFERING EVIDENCE OR ARGUMENT THAT IT RECEIVED ANYTHING LESS THAN $1,823,132 IN PPP LOANS.**

Cincinnati incorporates by reference the Statement of Facts and Argument set forth in support of Motion in Limine No. 1, above.

**WHEREAS**, Cincinnati respectfully requests this Court enter an order precluding Plaintiff from offering evidence or argument that it received anything less than $1,823,132 in PPP loans.

***MOTION IN LIMINE* #5** **FOR AN ORDER PRECLUDING PLAINTIFF FROM OFFERING EVIDENCE OR ARGUMENT THAT IT IS OBLIGATED, OR POTENTIALLY OBLIGATED, TO REPAY, OR OTHERWISE REIMBURSE SUMS RECEIVED UNDER STATE AND FEDERAL COVID-19 RELIEF PROGRAMS.**

Cincinnati incorporates by reference the Statement of Facts and Argument set forth in support of Motion in Limine No. 1, above.

**WHEREAS**, Cincinnati respectfully requests this Court enter an order precluding Plaintiff from offering evidence or argument that it is obligated, or potentially obligated, to repay, or otherwise reimburse sums received under state and federal COVID-19 relief programs.

***MOTION IN LIMINE* #6 TO PRECLUDE INTRODUCTION OF PAROLE EVIDENCE.**

In assessing whether an insurance policy is ambiguous, the court must read the contract as a whole and refrain from viewing provisions in isolation. *Evergreen*, 51 Kan. App. 2d at 497; *Nooter Corp. v. Allianz Underwriters Ins. Co.*, 536 S.W.3d 251, 264 (Mo. Ct. App. 2017). The relevant provisions of the subject insurance policy are not ambiguous. *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141 (8th Cir. 2021); *Zwillo V, Corp. v. Lexington Ins. Co.*, 2020 WL 7137110 (W.D. Mo. Dec. 2, 2020); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 491 F. Supp. 3d 455 (S.D. Iowa 2020), *affirmed, Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141 (8th Cir. 2021); *Promotional Headwear*, 504 F. Supp. 3d at 1201, n. 61.

Where an insurance policy is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parole evidence. *Steven Volkswagen v. Zurich Am. Ins. Co.*, 2020 WL 2615764, at *4 (D. Kan. May 22, 2020); *Garrett v. Am. Family Mut. Ins. Co.*, 520 S.W.2d 102, 112 (Mo. Ct. App. 1974). The policy is not ambiguous and all parole evidence should be excluded.

**WHEREFORE,** Cincinnati respectfully requests this Court to issue an Order in Limine excluding all evidence or references concerning Parole Evidence.

### *MOTION IN LIMINE* #7 **TO EXCLUDE EVIDENCE OF POLICY DRAFTING HISTORY.**

Any ISO Circulars, other insurance policies, references to insurance policy language not in the contract here, or references to exclusions not in the contract here, constitute parole evidence. Parole evidence is not admissible because the relevant policy provisions are not ambiguous. *Zwillo V, Corp. v. Lexington Ins. Co.*, 2020 WL 7137110 (W.D. Mo. Dec. 2, 2020); *Oral Surgeons, supra*; *Promotional Headwear, supra; Steven Volkswagen, supra*; *Garrett*, *supra*.

**WHEREFORE,** Cincinnati respectfully requests this Court issue an Order in Limine excluding all evidence or references to the drafting history of the Policy, including but not limited to evidence of ISO Circulars, other insurance policies, other potential policy language or provisions not included in the insurance Policy.

### *MOTION IN LIMINE* #8 **TO EXCLUDE OTHER CLAIMS AND LAWSUITS INVOLVING CINCINNATI.**

"Evidence which is not relevant is not admissible." Fed.R.Evid 402. Additionally, even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…" Fed.R.Evid. 403. Fed.R.Evid 404(b) generally excludes evidence of other acts for the purpose of proving a person

10

Case 4:20-cv-00437-SRB   Document 134   Filed 09/13/21   Page 10 of 14

or entity acted similarly on other occasions, and is based on the assumption that such evidence is of slight probative value yet very prejudicial. *Coletti v. Cudd Pressure Control,* 165 F.3d 767, 776 (10th Cir. 1999); *Hogan v. American Tel. & Tel. Co.,* 812 F.2d 409, 411 (8th Cir. 1987); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

Any evidence of similar claims or lawsuits is not relevant in this straightforward contract dispute. Plaintiff has not brought a claim for vexatious refusal or any other claim that could arguably make such evidence relevant here. As such, evidence of other claims and lawsuits against Cincinnati is irrelevant and not of probative value in this contract dispute.

**WHEREFORE,** Cincinnati respectfully requests this Court to issue an Order in Limine excluding evidence or argument concerning other claims and/or lawsuits involving Cincinnati.

## *MOTION IN LIMINE #9* **TO EXCLUDE EVIDENCE CONCERNING CINCINNATI'S POLICIES AND PROCEDURES.**

Cincinnati's policies and procedures, including but not limited to any policies or procedures for claim handling and setting reserves, are not relevant pursuant to Rule 401. And, even if they were relevant, which they are not, any minor relevance is substantially outweighed by the potential for prejudice pursuant to Fed.R.Evid 403. The sole issue in this case is whether the Policy, a contract, provides coverage for Plaintiff's alleged financial losses. Plaintiff has not made a vexatious refusal to pay claim or any other claim that could arguably make such evidence relevant here. As such, Cincinnati's policies and procedures, including but not limited to any policies or procedures for claim handling and setting reserves, are not relevant to the issues at bar. *See Strickland v. Taco Bell Corporation*, 849 S.W.2d 127, 133 (Mo.App. 1993). Case law likewise shows an insurer's policies and procedures are not relevant in a first-party claim. *State Farm Fire and Cas. Co. v. Valido*, 662 So.2d 1012, 1013 (Fla.App. 1995); *see also First Nat. Bank of Louisville v. Lustig,* 150 F.R.D. 548, 553 (E.D.La. 1993); *Johnson v. Liberty Mut. Fire Ins.*

11

*Co.,* 2011 WL 3606637, at 2 (10th Cir. 2011).

**WHEREFORE,** Cincinnati respectfully requests this Court issue an Order in Limine precluding evidence or argument concerning Cincinnati's policies and procedures, including but not limited to any policies or procedures for claim handling and setting reserves.

## *MOTION IN LIMINE* #10 TO EXCLUDE EVIDENCE OF THE AMOUNT OF RESERVES.

Pursuant to various state regulations, in certain situations, Cincinnati is required to reserve certain Reserves. *See e.g.* RSMo 379.102. Evidence concerning statutory reserve requirements is not admissible pursuant to Rules 401 (relevance), 403 (prejudicial), 404 (character), 405 (character), and 406 (habit). This is a pure breach of contract claim. Cincinnati's reserve amount is not at issue and does not make any fact of consequent more or less likely. Even if it were somehow relevant, it would be improper character evidence and its probative value is substantially outweighed by undue prejudice. *See, e.g.*, *Silva v. Basin W., Inc.*, 47 P.3d 1184, 1190 (Colo. 2002) ("Neither reserves nor settlement authority reflect an admission by the insurance company that a claim is worth a particular amount of money. Statutory requirements, limitations in the evaluation, and bargaining tactics limit the usefulness of reserves and settlement authority as valuations of a claim."); *Sunahara v. State Farm Mut. Auto. Ins. Co.*, 280 P.3d 649 (same); *Amica Mut. Ins. Co. v. Coan, Tr. for Williams*, 2020 WL 3396733, at *7 (D. Conn. June 19, 2020) (evidence concerning insurance reserves deemed irrelevant and unduly prejudicial).

**WHEREFORE,** Cincinnati respectfully requests this Court enter an Order precluding Plaintiff from offering evidence or argument concerning Cincinnati's reserves.

September 13, 2021.

Respectfully submitted by:

**DEFENDANT, THE CINCINNATI INSURANCE COMPANY**

12

LITCHFIELD CAVO LLP

BY: */s/ Ericka Hammett*
Daniel Litchfield     *PHV*
Ericka Hammett     *PHV*
303 West Madison Street
Suite 300
Chicago, IL 60606
(312) 781-6669 FAX (312) 781-6630
litchfield@litchfieldcavo.com
hammett@litchfieldcavo.com

WALLACE SAUNDERS

Michael L. Brown     KS# 21313
10111 West 87th Street
Overland Park, KS 66212
(913) 888-1000 FAX - (913) 888-1065
mbrown@wallacesaunders.com


ATTORNEYS FOR DEFENDANT THE
CINCINNATI INSURANCE COMPANY

CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to:

John J. Schirger
Matthew W. Lytle
Joseph M. Feierabend
Miller Schirger LLC
4520 Main St., Suite 1570
Kansas City, MO 64111
jschirger@millerschirger.com
mlytle@millerschirger.com
jfeierabend@millerschirger.com

Patrick J. Stueve
Bradley T. Wilders
Curtis Shank
Stueve Siegel Hanson LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
stueve@stuevesiegel.com
wilders@stuevesiegel.com
shank@stuevesiegel.com

J. Kent Emison
Patricia L. Campbell
Langdon & Emison LLC
911 Main Street
PO Box 220
Lexington, MO 64067
kent@lelaw.com
tricia@lelaw.com