# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| K.C. HOPPS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-00437-SRB |
| | ) | |
| THE CINCINNATI INSURANCE COMPANY, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Cincinnati Insurance Company, Inc.'s ("Defendant")

Motion for Summary Judgment (Doc. #97) and Plaintiff K.C. Hopps, Ltd.'s ("Plaintiff") Motion

for Partial Summary Judgment (Doc. #93). The Court held oral argument on the motions on

September 15, 2021. For the reasons set for below, Defendant's motion is GRANTED IN PART

and DENIED IN PART and Plaintiff's motion is DENIED.

## I. BACKGROUND

This lawsuit arises out of an insurance-coverage dispute between Plaintiff and Defendant.

Plaintiff seeks coverage for losses it sustained over the course of the COVID-19 pandemic. For

purposes of resolving the pending motions, the Court deems the following facts uncontroverted.[1]

Plaintiff owns and operates the following bars, restaurants, catering services, and/or event

spaces in the Kansas City metropolitan area: Blue Moose, LLC; Barley's Brewhaus, LLC;

Falcon Ridge Restaurant, LLC; Hopps Catering, LLC; Pan Fried 2, LLC; O'Dowd's, LLC;

---

[1] The relevant facts are taken from the record, including the parties' briefs and exhibits. The Court notes that the applicable standard requires the disputed facts to be viewed in the light most favorable to the non-moving party. Additional facts are addressed in Section III. Only those facts necessary to resolve the pending motions are discussed, and those facts are simplified to the extent possible.

Briarcliff Events, LLC; Arena Promotions, LLC; and Southeast KC Restaurant Co., LLC.
Plaintiff purchased an all-risk commercial property insurance policy from Defendant, Policy No.
EPP 012 40 51 for the period January 25, 2020, to January 25, 2023 (the "Policy"), which names
each of the above entities as named insureds.

The Policy provides that Defendant "will pay for direct 'loss' to Covered Property at the
'premises' caused by or resulting from any Covered Cause of Loss." (Doc. #99-1, p. 47.)[2]
"Loss" is defined as "accidental physical loss or accidental physical damage." (Doc. #99-1, p.
82.) The Policy does not define the terms "physical loss" or "physical damage." A "loss" is a
prerequisite to invoke the different coverages sought in this lawsuit. These coverages are set
forth below.

First, the Policy provides for Business Income coverage. Under this coverage, Defendant
agreed to:

> pay for the actual loss of 'Business Income' . . . you sustain due to the necessary
> 'suspension' of your 'operations' during the 'period of restoration'. The
> 'suspension' must be caused by direct 'loss' to property at a 'premises' caused by
> or resulting from any Covered Cause of Loss.

(Doc. #99-1, p. 62.) The Policy defines "Business Income" as "a. Net Income (net profit or loss
before income taxes) that would have been earned or incurred; and b. Continuing normal
operating expenses sustained, including payroll." (Doc. #99-1, p. 82.) "Period of restoration"
means:

> the period of time that:
>     a. Begins at the time of direct "loss".
>     b. Ends on the earlier of:
>         (1) The date when the property at the "premises" should be repaired,
>         rebuilt or replaced with reasonable speed and similar quality; or
>         (2) The date when business is resumed at a new permanent location.

---

[2] All page numbers refer to the pagination automatically generated by CM/ECF.

(3) The number of consecutive months after the date of direct physical 'loss' indicated in the Schedule of this endorsement.

(Doc. #99-1, p. 87.)

Second, the Policy provides for Extra Expense coverage. Under this coverage, Defendant promised to:

pay Extra Expense you sustain during the 'period of restoration'. Extra Expense means necessary expenses you sustain (as described in Paragraphs (2)(b), (c) and (d)) during the 'period of restoration' that you would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss.

(Doc. #99-1, p. 63.)

Third, the Policy provides for Civil Authority coverage, which states, in pertinent part:

When a Covered Cause of Loss causes damage to property other than Covered Property at a 'premises', [Defendant] will pay for the actual loss of 'Business Income' and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the 'premises', provided that both of the following apply:
(a) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and
(b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Doc. #99-1, p. 63.)

Fourth, the Policy provides for Ingress and Egress coverage. Under this coverage, Defendant agreed to pay:

for the actual loss of 'Business Income' you sustain and necessary Extra Expense you sustain caused by the prevention of existing ingress or egress at a 'premises' shown in the Declarations due to direct 'loss' by a Covered Cause of Loss at a location contiguous to such 'premises'. However, coverage does not apply if ingress or egress from the 'premises' is prohibited by civil authority.

(Doc. #99-1, p. 128.)

The Policy also includes a number of exclusions which Defendant contends applies to this dispute. In relevant part, the Policy provides:

(1) [Defendant] will not pay for 'loss' caused directly or indirectly by . . .
    (a) Ordinance or Law
        Except as provided in SECTION A. COVERAGE, 4. Additional coverages, g. Ordinance or Law, the enforcement of or compliance with any ordinance or law:
            1) Regulating the construction, use or repair of any building or structure . . .
        This exclusion applies whether 'loss' results from:
            1) An ordinance or law that is enforced even if the building or structure has not been damaged . . .
    (c) Governmental Action
        Seizure or destruction of property by order of governmental authority. . . .

(2) [Defendant] will not pay for 'loss' caused by or resulting from any of the following: . . .
    (b) Delay or Loss of Use
        Delay, loss of use or loss of market. . . .

(3) [Defendant] will not pay for 'loss' caused by or resulting from any of the following in Paragraphs 3(a) through (3)(c). However, if an excluded cause of loss that is listed in Paragraph (3)(a) though (3)(c) results in a Covered Cause of Loss, [Defendant] will pay for that portion of 'loss' caused by that Covered Cause of Loss: . . .
    (b) Acts or Decisions
        Acts or Decisions, including the failure to act or decide, of any person, group, or organization or governmental body.

(Doc. #99-1, pp. 49-54.)

In response to the COVID-19 pandemic, civil authorities in Missouri and Kansas issued Stay-at-Home orders in March of 2020. In accordance with the respective Stay-at-Home orders, Plaintiff's operations were limited to delivery, drive-thru, and carry out services. On March 24, 2020, Plaintiff submitted a claim to Defendant for coverage under the Policy for "Business Interruption due to COVID-19." (Doc. #99-2, p. 2.) Defendant denied Plaintiff's claim. On June 24, 2020, Plaintiff filed this lawsuit against Defendant. On August 12, 2020, the Court

4

denied Defendant's motion to dismiss, incorporating the same rationale for its denial of a motion to dismiss in *Studio 417, Inc., et al. v. The Cincinnati Insurance Company*, Case No. 20-cv-03127-SRB, which involved the interpretation of a substantially similar insurance policy.

On December 29, 2020, Plaintiff filed a First Amended Complaint. According to the First Amended Complaint, Plaintiff seeks Business Income, Extra Expense, Civil Authority, and Ingress and Egress coverage allegedly triggered by the presence of SARS-CoV-2[3] and related Stay-at-Home Orders. Count I seeks declaratory relief of the parties' respective rights and duties under the Policy, and requests the Court declare Plaintiff suffered losses covered by the Policy and that Defendant is obligated to pay Plaintiff for those losses. Count II alleges that Defendant is liable for breach of contract due to its refusal to provide coverage for Plaintiff's claims for losses due to SARS-CoV-2.

Both parties now move for summary judgment. Defendant's motion seeks dismissal of "Plaintiff's claims with prejudice" and a declaration that the "Policy does not apply to provide coverage for Plaintiff's alleged losses" in this case. (Doc. #97, p. 1.) Plaintiff's motion seeks partial summary judgment, specifically that "Plaintiff's claim under the Policy is a covered, physical loss under the Policy's plain language and that [Defendant] breached the Policy by wrongfully refusing coverage[.]" (Doc. #93, p. 1.) The Court addresses the parties' arguments below.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of

---

[3] SARS-CoV-2 is the virus that is responsible for causing COVID-19.

identifying "the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (cleaned up). If the moving party makes this showing, "the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.* (quotation marks omitted). If there is a genuine dispute as to certain facts, those facts "must be viewed in the light most favorable to the nonmoving party." *Id.*

## III. DISCUSSION

As threshold issues, the parties dispute which state law controls the interpretation of the Policy and the definition of "physical loss [or] physical damage." (Doc. #99, p. 82.) The parties address these disputes in their briefing for both motions. Both the controlling law and the proper interpretation of the Policy are questions of law. Accordingly, the Court will address these matters prior to addressing additional arguments advanced by the parties in support of their respective motions.

### A. Conflict of Law

The parties agree, and so does the Court, that state law controls the interpretation of the Policy. *See J.E. Jones Const. Co. v. Chubb & Sons, Inc.*, 486 F.3d 337, 340 (8th Cir. 2007) ("[S]tate law controls the constructions of [the] insurance policies[.]"). Defendant argues that Kansas law should apply if Kansas and Missouri law conflict. Plaintiff argues that Missouri law should apply if Kansas and Missouri law conflict. However, Defendant argues that "[t]here is no conflict in Kansas and Missouri's respective state laws governing insurance policy interpretation.

6

They apply the same insurance principles." (Doc. #98, p. 7.)[4] Plaintiff agrees, and so does the Court.

Before doing a conflict of law analysis, the Court "must first determine whether there is actually a difference between the relevant laws of the different states." *Consul General of Rep. of Indonesia v. Bill's Rentals, Inc.*, 330 F.3d 1041, 1045 (8th Cir. 2002). Upon review of Kansas and Missouri law, the Court finds both states use the same principles of insurance contract interpretation. For example, "[t]he interpretation of an insurance policy is a question of law to be determined by the Court." *Lafollette v. Liberty Mut. Fire Ins. Co.*, 139 F. Supp. 3d 1017, 1021 (W.D. Mo. 2015) (quoting *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. App. W.D. 2015)); *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 793 (Kan. 2002) ("The construction of a written instrument is a question of law[.]"). The Court must read the insurance contract "as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written." *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. App. W.D. 2011); *O'Bryan*, 56 P.3d at 792 ("In construing a policy of insurance, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used[.]").

Further, "[p]olicy terms are given the meaning which would be attached by an ordinary person of average understanding if purchasing insurance" and if the "insurance policies are unambiguous, they will be enforced as written absent a statute or public policy requiring

---

[4] Defendant later asserts that, should the Court follow its prior interpretation of the Policy and apply *Studio 417, Inc. v. The Cincinnati Insurance Company*, the Court "would create a conflict between Missouri and Kansas Law." (Doc. #98, p. 11.) From what the Court can ascertain, the reasoning for this assertion is that such a holding would conflict with the decision of *Promotional Headwear v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191 (D. Kan. 2020). However, as explained below, *Promotional Headwear* does not require the Court to define "physical loss" or "physical damage" in accordance with Defendant's interpretation. Also, Defendant agrees that the legal principles in Missouri and Kansas are the same. Even if the Court's holding in this Order conflicts with the decision in *Promotional Headwear*, differences in outcomes between two federal district courts based on the application of the identical insurance laws of Missouri and Kansas do not create a conflict of state law.

7

coverage." *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020) (applying Missouri law) (citation and quotation marks omitted); *O'Bryan*, 56 F.3d at 792 ("If an insurance policy's language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense. In such a case, there is no need for judicial interpretation or the application of rule of liberal construction.") (citations omitted). Policy terms are ambiguous "where there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." *Vogt*, 963 F.3d at 763; *O'Bryan*, 56 P.2d at 762-63 ("To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language[.]") (citation and quotation marks omitted). "If the language is ambiguous, it will be construed against the insurer." *Vogt*, 963 F.3d at 763; *O'Bryan*, 56 P. 3d at 792 (holding if policy language is ambiguous, "the policy will be liberally construed in favor of the insured.")

The Court finds Kansas and Missouri insurance policy interpretation laws do not conflict. Accordingly, the Court "do[es] not need to engage in a choice-of-law analysis." *Phillips v. Marist Soc'y of Washington Province*, 80 F.3d 274, 276 (8th Cir. 1996) (citing *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 613 (9th Cir. 1975)). The Court's outcome would be the same regardless of whether Missouri or Kansas law apply.

### B. Physical Loss or Physical Damage

Defendant argues that the Policy's terms "direct physical loss" or "direct physical damage" unambiguously requires that there be "actual, tangible, alteration to the property." (Doc. #98, p. 8.) Plaintiff argues that because the Policy uses the phrase "physical loss [or] physical damage," those terms must have different meanings, and thus Plaintiff need only show that SARS-CoV-2 is physical, and its presence caused a "loss of use of property" to establish

8

coverage. (Doc. #94, p. 16.) Specifically, Plaintiff argues that the Policy covers physical "contamination by a substance invisible to the naked eye, but which makes the property unsafe and results in the loss of use[.]" (Doc. #108, p. 4.) The Court addresses the parties' arguments below.

First, "direct," "physical loss" and "physical damage" are not defined in the Policy. The Court must in turn "rely on the plain and ordinary meaning of the phrase[s]." *Vogt*, 963 F.3d at 763; *see also O'Bryan*, 56 F.3d at 792. In its August 12, 2020, Order (Doc. #29), the Court adopted the definitions used in *Studio 417*, which applied the insurance policy interpretation principles discussed above. *See Studio 417, Inc. v. The Cincinnati ins. Co.,* 478 F. Supp. 3d 794, 800 (W.D. Mo. 2020) (discussing dictionary definitions of "direct" ("characterized by a close logical, causal, or consequential relationship"), "physical" ("having material existence: perceptive especially through the senses and subject to the laws of nature"), and "loss" ("the act of losing possession" and "deprivation") in determining the plain and ordinary meaning of the phrase "direct physical loss").

Defendant notes that the *Studio 417* Order "correctly anticipated that there would be subsequent legal developments, which have occurred." (Doc. #98, p. 8.) Defendant argues that these subsequent cases have further clarified the law on whether SARS-CoV-2 causes physical loss or physical damage, and that they consistently support Defendant's proposition that policies similar to the one in this case do not provide coverage absent an actual, tangible, alteration to the property.[5] Plaintiff disagrees, arguing that the majority of the cases cited by Defendant contain a

---

[5] While the Court need not address every case cited by Defendant and Plaintiff, contrary to Defendant's assertion, other cases in this district and in Missouri have agreed with this Court's prior interpretation of "physical loss." In fact, the only Missouri state court to decide this issue expressly adopted the Court's analysis. *Scott Craven DDS PC v. Cameron Mut. Ins. Co.*, No. 20CY-CV06381, 2021 WL 1115247, at *2 (Mo. Cir. Mar. 9, 2021) ("The ordinary person of average understanding, purchasing protection under the Policy would understand the inability to use the property due to a physical condition – here, the actual and/or threatened presence of COVID-19 – is physical loss covered under the Policy.") (citing *Neco Inc. v. Owners Ins. Co*, No. 20-cv-04211-SRB, 2021 WL 601501 (W.D. Mo. Feb. 16, 2021)).

virus exclusion that is missing from Defendant's Policy or actually support Plaintiff's argument that physical alteration is not required "where, as here, the virus physically contaminates the property and makes it unusable for its intended purpose." (Doc. #108, p. 8.)[6]

Defendant, in part, relies on *Oral Surgeons, P.C. v. The Cincinnati Ins. Co.*, 2 F.4th 1141 (8th Cir. 2021), which Defendant argues requires a finding that the Policy does not provide coverage for Plaintiff's claim. Plaintiff disagrees, arguing *Oral Surgeons* supports its argument that physical contamination can create a "loss" as defined by the Policy. The Court agrees with Plaintiff.[7]

In *Oral Surgeons*, the Eighth Circuit interpreted an identically worded policy which insured the plaintiff against lost business income and extra expense caused by "direct 'loss' to property." *Id.* at 1143. That policy "define[d] 'loss' as 'accidental physical loss or accidental physical damage.'" *Id.* Finding that the policy required plaintiff's "loss" to be "physical," the Eighth Circuit held:

> The complaint pleaded generally that [the plaintiff] suspended non-emergency procedures due to the COVID-19 pandemic and the related government-imposed restrictions. The complaint thus alleged no facts to show that it had suspended activities due to direct 'accidental physical loss or accidental physical damage,' regardless of the precise definitions of the terms 'loss' or 'damage.'

---

The Court finds that a Missouri state court interpreting its own state's insurance law is the best evidence of Missouri law on this issue. *See United Fire & Cas. Co. v. Titan Contractors Serv., Inc.* 751 F.3d 880, 883 (8th Cir. 2014) (holding the Court "must predict how the [Missouri Supreme] court would rule[] and [] follow decisions from the intermediate state courts when they are the best evidence of [the relevant state's] law.")

[6] The parties also dispute whether the phrase "physical loss or . . . physical damage" is ambiguous. However, as explained below, the ordinary and plain meaning of the words, developed case law, and the Policy read as a whole demonstrate that the Policy provides coverage for physical contamination. In turn, the Court need not address whether the phrase is ambiguous.

[7] As a preliminary inquiry, even though *Oral Surgeons* applied Iowa insurance law and drew on Minnesota law, the Court agrees with Defendant that *Oral Surgeons* "applies with equal force here" because Iowa insurance law is the same as Missouri and Kansas insurance laws. (Doc. #107, p. 4.) The Court finds that *Oral Surgeons* is binding.

10

*Id.* at 1145.  In turn, the Eighth Circuit rejected the plaintiff's argument that "the lost business income and the extra expense it sustained as a result of the suspension of non-emergency procedures were caused by direct loss to property."  *Id.* (quotation marks omitted).

That holding does not preclude coverage in this case.  The Eighth Circuit clarified that "[t]his appeal presents only the question whether the COVID-19 pandemic and the related government-imposed restrictions constitute direct 'accidental physical loss or accidental physical damage' under the policy."  *Id.* at 1145 n.2.  In accordance with *Oral Surgeons*, the Court finds Plaintiff, to the extent it argues that it sustained "physical loss" or "physical damage" simply because the COVID-19 pandemic resulted in Stay-at-Home orders, may not proceed on that theory of coverage.

However, the Eighth Circuit did not determine that SARS-CoV-2 can never cause "physical loss" or "physical damage."  Instead, the Eighth Circuit held that the "policy here clearly requires direct 'physical loss' or 'physical damage' to trigger business interruption and extra expense coverage.  Accordingly, there must be some physicality to the loss or damage of property—*e.g.*, a physical alteration, physical contamination, or physical destruction."  *Id.* at 1144 (citations omitted).  In turn, the Court agrees with Plaintiff that *Oral Surgeons* supports its position that "proof of physical contamination is sufficient to meet the Policy's requirement for physical loss or damage."  (Doc. #112, p. 2.)  As explained in detail below, unlike the plaintiff in *Oral Surgeons*, Plaintiff submits evidence supporting the inference that SARS-CoV-2 is physical, contaminated its premises, and made Plaintiff's property unsafe.  This theory of "loss" is recoverable under the plain language of the Policy.  *See Studio 417*, 478 F. Supp. 3d at 802 (holding that the plaintiffs in *Studio 417* adequately alleged a "physical loss" because they "expressly allege[d] physical contamination.").

11

To be sure, the Policy, read as a whole, supports the interpretation that the "physical loss" or "physical damage" requirement can be satisfied by proof of physical contamination. Specifically, the Policy excludes coverage for a number of "contaminants," including "nuclear reaction or radiation, or radioactive contamination," "smoke, vapor or gas from agricultural smudging or industrial operations," and the "[p]resence, growth, proliferation, spread or any activity of 'fungi', wet or dry rot or bacteria." (Doc. #99-1, p. 52-53.) Plaintiff argues, and the Court agrees, that narrowly interpreting the Policy by which physical contamination could never constitute a "loss" would render these exclusions meaningless. Courts consistently reject such a result. *See Murray v. Am. Family Mut. Ins. Co.*, 429 F.3d 757, 766 (8th Cir. 2005) ("construction or interpretation of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible [to] another construction which gives effect to all its provisions and is consistent with the general intent.") (citations and quotation marks omitted) (applying Missouri law); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 104 P.3d 997, 1002-03 (Kan. Ct. App. 2005) ("[A] specific exception in [Defendant's] policy to the . . . exclusion for subcontractor work is inconsistent with [Defendant's] narrow interpretation of 'occurrence.' . . . [Plaintiff] argues that if 'occurrence' is narrowly defined as urged by [Defendant], the subcontractor proviso would be rendered meaningless. We agree with [Plaintiff.]"). Defendant chose to exclude some contaminates, yet decided not to exclude others, such as viruses. Both Missouri and Kansas law require the Policy be read as a whole, including what was and was not excluded.

Defendant attempts to distinguish the excluded contaminates from SARS-CoV-2. Defendant argues that "all of the excluded conditions could be reasonably expected to cause actual, tangible alteration to property." (Doc. #113, p. 13.) During oral argument, Defendant

12

stressed that, while the excluded contaminates cause permanent changes to the property and make them uninhabitable, SARS-CoV-2 can be easily cleaned and, over a period of time, dies off without any need for repair. However, the Court agrees with Plaintiff that this distinction "does not square with a list of exclusions that includes . . . bacteria." (Doc. #108, p. 4.) In turn, the Court is not persuaded by Defendant's arguments and refuses to render the exclusions meaningless by narrowly defining "physical loss" and "physical damage" to categorically exclude physical contamination. Other courts interpreting substantially similar policy language agree. *See, e.g.*, *Serendipitous, LLC/Melt v. Cincinnati Ins. Co.*, No.: 2:20-cv-00873-MHH, 2021 WL 1816960, at *5 (N.D. Ala. May 6, 2021) ("The policy language indicates that the insurer understands that an insured may suffer physical loss without physical alteration of property because the policy excludes from coverage some expenses incurred because of invisible substances like vapor and fumes. Cincinnati could have excluded invisible substances like viruses but did not.")

Defendant also argues *Promotional Headwear, Int'l v. The Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191 (D. Kan. 2020), supports its position that the Policy does not provide coverage for SARS-CoV-2 because the virus does not cause direct physical loss. The Court disagrees. First, this Court is not bound by *Promotional Headwear*. Still, *Promotional Headwear* held that, "'direct physical loss' requires some sort of intrusion or contamination on the property." *Id.* at 1198. Thus, *Promotional Headwear*, like the Eighth Circuit in *Oral Surgeons*, recognized that physical contamination could create physical loss or physical damage. Second, even though *Promotional Headwear* stated, "assuming that the virus physically attached to covered property, it did not constitute the direct, physical loss or damage required to trigger coverage because its presence can be eliminated," that court did not have the benefit of discovery and expert

13

testimony.  Here, as explained below, Plaintiff provides evidence which raises a genuine issue of material fact of whether SARS-CoV-2 can be easily eliminated.

Defendant also contends that the need for a "period of restoration" exemplifies the need for a permanent, physical alteration because it requires the need for the property to be repaired, rebuilt, or replaced.  However, the Policy does not state that the "physical loss" or the "physical damage" must be permanent, and the Court refuses to read that limitation into the Policy.  The Policy also alternatively defines the "period of restoration" as the "number of consecutive months after the date of direct physical 'loss'[.]"  (Doc. #99-1, p. 87.)  The Court agrees with Plaintiff that this provision is not a definition of coverage, but instead describes a time period during which loss of business income may be recovered.

Accordingly, the Court finds that "physical loss" or "physical damage" under the Policy not only includes actual, tangible physical alteration of the property, but also includes physical contamination which renders the property unsafe.  With this interpretation in mind, the Court now turns to the parties' respective motions.

### C.  Defendant's Motion for Summary Judgment

Defendant contends that even if the Policy provides coverage for SARS-CoV-2, Plaintiff has failed to demonstrate that SARS-CoV-2 caused physical loss or physical damage to Plaintiff's property.  Defendant also argues that Plaintiff never sustained an "actual loss" as required for Business Income coverage, is not entitled to Civil Authority coverage or Ingress and Egress coverage, and that certain Policy exclusions preclude coverage.  Plaintiff disagrees, and the Court addresses the parties' arguments below.

14

### 1. Plaintiff Demonstrates It Suffered a Direct Physical Loss or Damage to Property

Defendant argues that Plaintiff cannot demonstrate it suffered a physical loss or physical damage because it does not have any evidence that the virus was present on its premises, Plaintiff used its premises throughout the relevant time, and the virus did not render its property unsafe. Plaintiff argues its evidence shows the virus was highly likely on its premises, Plaintiff had to reduce or cease its operations because of the presence of the virus, and the presence of the virus made its premises unsafe during the relevant time period. The Court agrees with Plaintiff.

The Court finds Plaintiff has sufficient evidence to support the inference that SARS-CoV-2 was present on its premises, this raising genuine issues for trial. Plaintiff relies on the expert opinion of Dr. Marc Goodman ("Goodman"), "an academic molecular epidemiologist." (Doc. #136-6, p. 59.) Goodman's expert report states that:

> SARS-CoV-2 has a physical presence. It can exist in the air and on surfaces for indeterminate periods of time and can be transferred from the air and surfaces into human bodies. When present in the air and on surfaces, SARS-CoV-2 makes the air and those surfaces dangerous transmission mechanisms for COVD-19.

(Doc. #136-6, p. 74.) Goodman further states that:

> The majority of SARS-CoV-2 clusters are linked to indoor settings. SARS-CoV-2 stability in indoor environmental conditions may be an important determinant of superspreading risk. Emerging data indicate that SARS-CoV-2 is shed to the environment as small, virus-laden particles during toileting, through contact with fomites and from infected patients. Typical climate-controlled conditions indoors (moderate temperature and low humidity), such as that found in bars and restaurants, are favorable for virus stability highlighting the importance of proper personal protective equipment and improved ventilation for preventing SARS-CoV-2 transmission risks associated with indoor gatherings.

(Doc. #136-6, p. 63.) Goodman concludes that it is his expert opinion that:

> Based on the available data and what we know about SARS-CoV-2 spread, it is more likely than not — indeed, it is highly likely — that the virus was present on the premises of K.C. Hopps' bars and restaurants by the time state and local stay-

at-home orders were announced in mid -March effectively suspending K.C. Hopps' bar and restaurant operations.

(Doc. #136-6, p. 76.)

Defendant argues that despite Goodman's conclusion, he never specifically tested Plaintiff's premises. However, Goodman explains that "[b]ased on the lag in testing for SARS-CoV-2, proof that a patron, employee, vendor or other person on the premises of one of K.C. Hopps' bars or restaurants tested positive for COVID-19 in early March is likely an unattainable and unrealistic standard." (Doc. #136-6, p. 73.) Goodman instead relies on data related to the community spread of the virus in the Kansas City area and the particular vulnerability of bars and restaurants to sustain and spread the virus to support his expert opinion. Contrary to Defendant's argument, Goodman's report amounts to more than a scintilla of evidence to support his conclusions and does more than rely on the general existence of the COVID-19 pandemic. Plaintiff does not need definitive proof of the virus's presence, but instead must prove that it was more likely than not that the virus physically contaminated its premises. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (2016) (holding the standard a court must apply at the summary judgment stage is "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict."). Also, Plaintiff's corporate representative, Ed Nelson ("Nelson"), testified that fifty employees were infected with COVID-19 in the summer of 2020, further bolstering Plaintiff's contention that the virus was present on its premises during the relevant time period. (Doc. #136-1, p. 36.) While the Court agrees with Defendant that Plaintiff will have to convince a jury that the virus was in fact on its premises, Goodman's report, and the fact that employees were infected with the virus, supports the finding of an evidentiary dispute which survives summary judgment.

16

Plaintiff also relies on the expert testimony of Dr. Alexander M. Klibanov ("Klibanov"), who is a "Professor Emeritus of Chemistry and Bioengineering at the Massachusetts Institute of Technology." (Doc. #136-5, p. 52.) In his expert report, Klibanov states that SARS-CoV-2 is physical, it attaches to surfaces, and absent removal of the virus, the property is rendered unsafe. Further, the report explains that without limited operations and substantial cleaning efforts, the virus will continue to replenish on the property. Klibanov testifies that the virus remains infectious on property for up to several days and it creates a chemical bond with the surface. This testimony not only supports the inference that SARS-CoV-2 can physically contaminate property causing "physical loss," but also that the virus creates an actual, tangible alteration to the property.

For example, Klibanov states that:

SARS-CoV-2 . . . like other respiratory viruses, is expelled from the mouth and/or nose within respiratory droplets when humans cough, sneeze, scream, sing, or even speak loudly or breathe heavily.

Consequently, mouth and nose secretions, including saliva, nasal discharge, and respiratory secretions such as mucus, form an aerosol cloud in the surrounding air. The expelled aqueous droplets comprising it contain multiple copies of suspended infectious SARS-CoV-2 viral particles. . . .

The suspended viral particles undergoing thermal (Brownian) motion within such a droplet can then themselves collide with the host surface and nonspecifically adsorb to it (i.e., form a noncovalent chemical bond with it; adsorption is not to be confused with absorption, where the virus is taken up by the volume, as opposed to just the outside surface) if this adsorption is energetically favorable. Furthermore, the landed-droplet's water will undergo evaporation, and eventually some fraction of the viral particles may end up being deposited onto the surface either directly or indirectly . . .

there is an actual chemical bond between the viral particle and the surface; in this scenario, the virus is relatively hard to detach. . . .

While certain disinfectants, such as aqueous detergents, can both inactivate the virus and remove it from surfaces, some others, like fumigants and ultraviolet light, only inactivate. In either case, however, it is difficult to locate and reach every

17

contaminated surface; likewise, due to the manner in which the virus spreads, it is difficult to completely eradicate the virus, particularly in a restaurant-type environment, even with robust and comprehensive routine cleaning protocols.

Whether adsorbed or simply physically deposited (and in various intermediate scenarios), viral particles will remain on the surface pretty much indefinitely if left undisturbed. In other words, when adsorbed or deposited on a surface, respiratory droplets and aerosols expelled from infected persons physically change the surface by becoming a part of that surface. As a result of this physical alteration, human contact with previously safe surfaces may become unsafe. . . .

When a person touches a surface containing an infectious virus and then his/her mouth, eyes, or nose, the person may become infected and ultimately come down with COVID-19 and/or infect others. . . .

Depending on specific circumstances, the SARS-CoV-2 virus has been reported to remain infectious for time periods ranging from minutes to days: in aerosols for up to many hours, while on hospitable surfaces for as long as up to several days.

(Doc. #136-5, pp. 5-10.) The Court finds Plaintiff has sufficient evidence by which a reasonable juror could conclude that the virus was present and rendered its property unsafe. Defendant is thus not entitled to summary judgment on this point.

Defendant further argues Plaintiff did not sustain a direct physical loss or physical damage because "those premises were used throughout the relevant time period." (Doc. #98, p. 15.) The Court agrees with Plaintiff that the record supports the inference that its operations were reduced to limit the spread of SARS-CoV-2 on its premises. As noted above, the Stay-at-Home orders required Plaintiff to reduce its operations, and doing so would limit the ability for the virus to replenish on Plaintiff's premises. The reduction in operations thereby mitigated Plaintiff's potential physical loss or physical damage caused by SARS-CoV-2. Also, Plaintiff may recover under the Policy even if it still used its property in a limited capacity. The Policy provides that Defendant will "reduce the amount" of business income "to the extent you can resume your 'operations,' in whole or in part, by using damaged or undamaged property . . . at the 'premises' or elsewhere." (Doc. #99-1, p. 77.) While the fact that the premises were still

18

used in some capacity is relevant to the extent of Plaintiff's damages, that fact does not preclude coverage.

Defendant disputes whether every location reduced operations, such as O'Dowd's shutting down entirely, because of the presence of the virus. The Court finds this, too, more impacts the extent of Plaintiff's damages and does not preclude coverage. Whether the virus was present on Plaintiff's premises, whether it actually caused a physical loss or physical damage to Plaintiff's premises, and the extent of Plaintiff's damages due to that "loss" is a question of fact best left for a jury to decide. Plaintiff has established the existence of genuine issues of material fact these issues.

**2. Business Income Coverage – Plaintiff Has Sustained Damages**

Defendant argues that Plaintiff has not suffered an "actual loss" of income required to trigger Business Income coverage. Defendant contends that while Plaintiff's damages expert, Kevin Grudzien, testified that Plaintiff suffered "$1,727,739 as a result of COVID-19," (Doc. #136-7, p. 113), Plaintiff "has received more in pandemic relief, including forgiven PPP loans, than it claims in damages." (Doc. #113, p. 12.) Plaintiff argues the purpose of the government relief was to keep workers paid and employed, not to compensate Plaintiff for its lost business income, and therefore Plaintiff still sustained an "actual loss."[8] The Court agrees with Plaintiff.

Under the Policy, "Business Income" is "Net Income (net profit or loss before income taxes) that would have been earned or incurred[.]" (Doc. #99-1, p. 82.) While the parties do not dispute that the relief Plaintiff received was an amount more than the business income it claims to have lost, whether this relief precludes coverage depends on the purpose of the relief. The

---

[8] Plaintiff additionally argues that the Policy does not provide a "setoff" due to the government relief it received and that such a setoff is barred by the collateral source doctrine. In oral argument, Defendant clarified it was not seeking a "setoff" but instead contends that Plaintiff has not sustained an "actual loss" as required to establish Business Income coverage. Accordingly, the Court need not address this issue.

19

parties, in part, rely on *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, No. CV 05-08444 DDP, 2013 WL 3946103 (C.D. Cal. July 31, 2013). The *Northrop* court analyzed whether the Katrina Emergency Tax Relief Act of 2005 and the Gulf Opportunity Zone Act of 2005, which gave the insured $9.4 million in tax credits, amounted to a "recovery" under which full payment of the insurance payment would constitute a windfall. *Id.* at \*2. The *Northrop* court held that:

> the Tax Credit here was intended as an incentive for employers to retain employees, not as a compensation for loss. As one congressman put it, '[s]everal of these provisions . . . help businesses, help employers; and, of course, we are trying to encourage employers in these affected areas to bring workers back and to create jobs so that people can come back and have an income.'

*Id.* at \*5 (quoting 151 Cong. Rec. H8189–01 (2005) (statement of Cong. McCrery)). Because the relief's purpose was not "a compensation for a loss but instead an incentive to encourage employee retention," the tax credit did not amount to a "recovery" under the policy. *Id.*

In contrast, in *PMA Capital Ins. Co v. US Airways, Inc.*, 626 S.E.2d 369 (Va. 2006), the court determined whether the Air Transportation Safety and System Stabilization Act (the "Stabilization Act") should reduce the insured's compensation received under the insurance policy. *Id.* at 371. The *PMA* court held, "By its plain language, the Stabilization Act was designed to 'compensate air carriers' like US Airways for both 'direct losses' as a result of 'any Federal ground stop order' and 'incremental losses' as a 'direct result of' the September 11, 2001, terrorist attacks." *Id.* at 359 (citations omitted). Because the purpose of the Stabilization Act was to compensate the insured for the losses it sustained, the same losses which the insurance policy covered, the insured was required to "reduce its claim for business interruption losses by the amount of the funds received from the federal government under the Stabilization Act." *Id.* at 360.

20

The Court finds this case is more on point with *Northrop* than *PMA*. For example, the Paycheck Protection Program ("PPP") loans had the "central purposes of keeping workers paid and employed" during the COVID-19 pandemic. *Business Loan Program Temporary Changes; Paycheck Protection Program – Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act*, 86 Fed. Reg. 8283-02, 8285, 2021 WL 394729 (Feb. 5, 2021). The PPP loans did not compensate Plaintiff for its lost business income due to the presence of SARS-CoV-2 on its premises, but instead incentivized employee retention. Plaintiff would have received the PPP loans regardless of whether Plaintiff had to suspend operations its operations. Even if the PPP loans could be considered "income" as meant under the Policy language, assuming Plaintiff's damage calculation is correct, Plaintiff would have earned over $1.7 million more than it did had it not sustained a "loss." The Court thus finds that Plaintiff adequately provides evidence supporting that it sustained an "actual loss" of "Business Income" which "would have been earned or incurred" absent the presence of SARS-CoV-2 on its premises.

Defendant attempts to distinguish *Northrop* by arguing that case involved a tax credit, not government compensation. Because the Policy calculates loss prior to taxes, Defendant argues *Northrop* is irrelevant here. The Court disagrees. As explained above, *Northrop* distinguished itself from *PMA* not on the basis that it was a tax credit, but on the purpose of the government relief. *Northrop*, 2013 WL 3946103, at *5. Because the purpose of the PPP loans was not to compensate Plaintiff for a loss covered by the Policy, Plaintiff has properly demonstrated a genuine dispute regarding its loss of business income.

Finally, Defendant argues that because the PPP loans received by Plaintiff were forgiven, this case is an inappropriate attempt to obtain a windfall. In oral argument, Plaintiff conceded that at least the first PPP loan, worth approximately $1.8 million, was forgiven. However, PPP

21

loans were not automatically forgiven. Businesses, such as Plaintiff, had to spend the money, for example, on payroll costs. *Business Loan Program Temporary Changes*, 86 Fed. Reg. at 8289 ("In general, payroll costs paid or incurred during the covered period are eligible for forgiveness."). These requirements bolster the conclusion that the relief Plaintiff received was not "income," such as a gift from a friendly relative, as Defendant analogized in oral argument, but was a loan with specific condition-precedents Plaintiff had to satisfy before it was forgiven. As such, the government relief Plaintiff received does not preclude coverage under the Policy.

### 3. Plaintiff Fails to Establish Civil Authority Coverage and Ingress and Egress Coverage

Defendant argues that Plaintiff is not entitled to Civil Authority coverage and Ingress and Egress coverage because Plaintiff retained at all times access to its premises. Plaintiff disagrees, arguing that the Stay-at-Home orders dramatically decreased its level of business and therefore it is entitled to Civil Authority Coverage. Plaintiff also argues that the virus was on contiguous properties, which is enough to establish Ingress and Egress coverage. The Court agrees with Defendant.

Civil Authority coverage requires that "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority[.]" (Doc. #99-1, p. 63.) Similarly, Ingress and Egress coverage requires "the prevention of existing ingress or egress at a 'premises'[.]" (Doc. #99-1, p. 128.) However, Nelson testified unequivocally that he was still able to "get in to [his] business and do maintenance and cleaning and whatever[.]" (Doc. #136-1, p. 31.) While the Stay-at-Home orders limited Plaintiff's operations, they did not prevent Plaintiff from accessing its premises. As such, Defendant is entitled to summary judgment on Plaintiff's Civil Authority coverage and Ingress and Egress coverage claims.

### 4. Policy Exclusions

Defendant also argues that it is entitled to summary judgment because the "Ordinance or Law," "Delay or Loss of Use," and "Acts or Decisions" exclusions preclude coverage. Plaintiff argues, in part, that these exclusions do not apply because an ordinance or law, delay or loss of use, and acts or decisions of others did not cause Plaintiff's "loss." As previously explained, "loss" is defined as "accidental physical loss or accidental physical damage." (Doc. #99-1, p. 82.) Plaintiff's claims arise from the presence of SARS-CoV-2 on its premises. The record does not show that these exclusions "caused" SARS-CoV-2 to enter Plaintiff's premises. In turn, these exclusions do not apply to Plaintiff's claims.

The Court finds Plaintiff has established the existence of a genuine issues of material fact regarding whether it sustained a covered "loss" caused by the presence of SARS-CoV-2 on its premises. Plaintiff may be entitled to recover under the Policy's Business Income coverage and Extra Expense coverage, and Defendant may have breached the Policy by denying such coverage. However, Defendant is entitled to summary judgment on Plaintiff's Civil Authority coverage claim and Ingress and Egress coverage claim.

### D. Plaintiff's Motion for Summary Judgment

Plaintiff argues it is entitled to summary judgment because, as a matter of law, its claims are covered losses. Defendant disagrees, arguing Plaintiff has not submitted sufficient evidence of a direct physical loss or physical damage to entitled it to summary judgment. The Court agrees with Defendant.

The Court finds the parties largely reiterate the same arguments they made regarding Defendant's motion for summary judgment. In accordance with the Court's analysis above, this case has genuine issues of material fact, including whether the virus was present on Plaintiff's premises, whether Plaintiff's operations were reduced to remediate that physical loss or physical

damage, and the extent of Plaintiff's damages. In turn, Plaintiff is not entitled to summary judgment.

Defendant contends that "Plaintiff relies upon speculative assertions that it is 'likely' or 'highly likely' that the virus was present on its premises" and that this is not sufficient to prove the virus's presence on Plaintiff's property. While the Court has already explained that Goodman's testimony is more than just mere speculation, whether the jury chooses to believe Goodman and finds the virus is actually present is an issue which precludes Plaintiff's summary judgment motion.

Defendant's own experts refute at least some of Plaintiff's expert testimony. For example, Defendant relies on the testimony of Dr. Wayne Thomann ("Thomann"), who is an "Assistant Professor of Family Medicine and Community Health at Duke University [and] the Director Emeritus of the Duke University and Health System Occupational & Environmental Safety Office. (Doc. #100-2, p. 3.) Thomann states, in part, that:

> the CDC has stated that touching surfaces is not thought to be a common way the virus spreads, and recently, expanded on this position in saying 'based on available epidemiological data and studies of environmental transmission factors, surface transmission is not the main route by which SARS-CoV-2 spreads, and the risk is considered to be low.' . . .
>
> It is my opinion that SARS-CoV-2 has not modified, degraded, or altered the performance, appearance or intended use of materials. It has not modified, degraded, or altered the performance, appearance or intended use of building materials or mechanical systems, such as would happen in the situation of corrosion or other degradation of building or mechanical components. . . .
>
> The virus is not everywhere, in every building or on every surface in every building. The scientific reason for closing facilities and businesses has not been because the virus is present in all buildings. Rather, the scientific reason for such closures has been to keep people separated and thus avoid person-to-person transmission of the disease. . . .

(Doc. #100-2, pp. 5-10.)  The Court finds Thomann's testimony creates a genuine issue of material fact regarding the extent of physical loss or physical damage caused by SARSCoV-2 on Plaintiff's premises, including whether the virus was actually on Plaintiff's premises.

Defendant also relies on the testimony of Dr. Keith Armitage ("Armitage"), who is "licensed to practice medicine in the State of Ohio, and [is] board certified in Internal Medicine and Infectious Diseases."  (Doc. #100-3, p. 2.)  The Court finds that Armitage's testimony creates a genuine issue of material fact regarding the nature of SARS-CoV-2, including the extent the virus causes physical loss or damage.  Specifically, Armitage states that:

> I have reviewed the reports of Marc Goodman, Ph.D., MPH and Dr. Alexander M. Klibanov, Ph.D. in the above matter.  I fundamentally disagree with their assessment of the impact of SARS-CoV-2 fomites on surfaces.  In his report, Dr. Goodman indicated that a strict cleaning regimen of surface in the case of SARS-CoV-2 contamination 'is unlikely to eradicate all viral particles.'  The Center for Disease Control (CDC) has recently markedly deemphasized the role of fomites in SARS-CoV-2 transmission, and multiple reports have indicated that transmission by fomites is rare.  The CDC is the preeminent organization for disseminating truthful scientific information regarding the SARS-CoV-2 virus and the Covid-19 pandemic.  The CDC reported that simple cleaning with soap and water is adequate in most cases, and more aggressive cleaning is highly effective if there is significant concern for contamination. . . . [I]f the virus was present in K.C. Hopps bars and restaurants by the time stay-at-home orders were announced in Kansas City in March 2020, the presence of the virus in these facilities would have been very transient, easily remediated, and, without question not permanent.
>
> In his report Dr. Klibanov states the virus 'adheres/attaches to or lands on surfaces' and 'viral particles are adsorbed to a host surface . . . and the virus is relatively hard to detach.' . . . If the implication of this statement is that there is some permanent presence of the virus or alteration to a surface when contaminated with a virus, this is completely incorrect.  It is well known that many of the common cold viruses, some of which are less lethal coronaviruses, transiently contaminate surfaces, but there is no evidence at all that transient viral contamination of a surface produces any permanent changes in the structure of the surface, or that there is viable virus on the surface after time and/or cleaning degrade and eliminate viral particles. Surface contamination of inanimate objects by viruses is similar to contamination by dust particles—in that it can be very easily remediated by simple cleaning, and does not alter the object.  It is completely incorrect that surfaces remain 'infectious' with time (hours to days) and/or simple cleaning with soap and water.

(Doc. #100-3, pp. 3-4.)  Resolving expert opinions is the "near-exclusive province of the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459 (2016).

Finally, Defendant demonstrates a genuine issue of material fact as to the extent of Plaintiff's damages.  For example, Defendant points to Nelson's testimony in which he explained that the O'Dowd's location was fully closed because "it was our assessment that the food sales, and in particular the carry-out food sales, was so low that it would not be worthwhile staying open just for that."  (Doc. #136-1, p. 27.)  A genuine issue of material fact exists regarding the precise reason for Plaintiff limiting its operations and the extent of Plaintiff's damages.

Whether the virus was present on Plaintiff's premises, whether it actually caused a physical loss or physical damage to Plaintiff's premises, and the extent of Plaintiff's damages due to that "loss" are genuine issues of material fact which preclude summary judgment. Plaintiff's motion is denied.

## IV.  CONCLUSION

Accordingly, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment (Doc. #97) is GRANTED IN PART and DENIED IN PART.  The motion is granted insofar as Plaintiff's claims for Civil Authority coverage and Ingress and Egress coverages are dismissed. The motion is denied in all other aspects.

It is **FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. #93) is DENIED.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated:  September 21, 2021