**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| K.C. HOPPS, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 4:20-CV-437 |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CINCINNATI INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S SUPPLEMENTAL BRIEF REGARDING
<u>ADMISSIBILITY OF TAXPAYER AID</u>**

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... 3

INTRODUCTION ...................................................................................................................... 1

RELEVANT POLICY PROVISIONS ........................................................................................ 1

EXPERT TESTIMONY ............................................................................................................. 3

ARGUMENT .............................................................................................................................. 5

A.    The Terms of the Policy Do Not Permit Cincinnati an Offset for Taxpayer Aid Because the Aid is Not Business Income. ................................................................................................ 6

B.    Loans Forgiven After March 23, 2021 are Irrelevant Because They Are Outside the Period of Restoration. .............................................................................................................. 11

C.    Excluding Evidence of Taxpayer Aid is Necessary to Prevent Plaintiff From Being Penalized for Seeking Taxpayer Aid. ......................................................................... 13

D.    The Collateral Source Rule Also Bars Evidence of Taxpayer Aid. ............................... 14

CONCLUSION ........................................................................................................................ 16

# TABLE OF AUTHORITIES

Cases

*Boardwalk Apts, L.C. v. State Auto Prop. & Cas. Ins. Co.,*
    11 F. Supp. 3d 1062 (D. Kan. 2014) ................................................................. 16

*Bowan ex rel. Bowan v. Gen. Sec. Indemn. Co. of Arizona,*
    174 S.W.3d 1 (Mo. App. E.D. 2005) .................................................................. 6

*Brill as Tr. for Brill v. Mid-Century Ins. Co.,*
    965 F.3d 656 (8th Cir. 2020) ............................................................................. 6

*Crump v. State Farm Mut. Auto. Ins. Co.,*
    961 F.2d 725 (8th Cir. 1992) ........................................................................... 10

*Eidelman v. State Farm Fire & Cas. Co.,*
    2011 WL 198501 (E.D. Pa. June 19, 2011) ....................................................... 16

*Gen. Am. Life Ins. Co. v. Barrett,*
    847 S.W.2d 125 (Mo. App. W.D. 1993) .............................................................. 9

*LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co.,*
    146 P.3d 1088 (Kan. 2006) ................................................................................ 9

*Milburn Enterpr., Inc.,*
    233 P.3d 205 (Kan. 2010) ................................................................................ 14

*Nautilus Ins. Co. v. Heartland Builders, LLC,*
    No. 219CV02624JARKGG, 2021 WL 929786 (D. Kan. Mar. 11, 2021) ............... 9

*Nooter Corp. v. Allianz Underwriters Ins. Co.,*
    536 S.W.3d 251 (Mo. App. E.D. 2017) ............................................................... 9

*Overton v. U.S.,*
    619 F.2d (8th Cir. 1980) ............................................................................ 14, 15

*Polston v. Aetna Life Ins. Co.,*
    932 S.W.2d 786 (Mo. App. E.D. 1996) ............................................................... 6

*Polymer Plastics Corp. v. Hartford Cas. Ins. Co.,*
    2006 WL 8429774 (D. Nev. Sept. 26, 2006) ..................................................... 16

*Shelter Mut. Ins. Co. v. Ganaway,*
    694 S.W.2d 521 (Mo. App. W.D. 1985) .............................................................. 9

*State ex rel. Blue Springs Sch. Dist. v. Grate,*
    576 S.W.3d 262 (Mo. App. W.D. 2019) .............................................................. 9

*Vogt v. State Farm Life Ins. Co.,*
    963 F.3d 753 (8th Cir. 2020) ........................................................................ 8, 13

Case 4:20-cv-00437-SRB    Document 181    Filed 10/08/21    Page 3 of 21

# INTRODUCTION

According to the clear language of the Policy, Plaintiff is entitled to damages equal to the likely "Business Income" it would have enjoyed but for having to suspend its business activities. Business Income is defined in the Policy as the likely net income that Plaintiff would have earned but for having to suspend its operations (*i.e.,* projected gross income less projected expenses). Business Income must be reduced, however, by any income that Plaintiff actually earned (due to partial operations) less the expenses Plaintiff actually incurred. Nothing in the Policy permits Cincinnati to transfer to itself the taxpayer aid provided to Plaintiff by federal, state, and local governments during the pandemic. Despite insisting Cincinnati was not seeking to use the aid as an "offset," that is *exactly* how Cincinnati's expert describes it. But neither the terms of the Policy nor the collateral source rule permit Cincinnati to take that offset. Indeed, as the Court has already held, Plaintiff would have been entitled to taxpayer aid even if its business activities had not slowed down or ceased. Thus, permitting the jury to consider evidence of taxpayer aid would amount to a windfall to Cincinnati and would leave Plaintiff in a worse position than it would have enjoyed if it had not purchased and paid for business interruption insurance in the first place.

Accordingly, Plaintiff respectfully asks that the Court to exclude all evidence, argument or reference to all forms of pandemic-related taxpayer aid at trial.

# RELEVANT POLICY PROVISIONS

The Policy provides:

> We will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations"[1] during the "period of restoration."[2]

The phrase "Business Income" is further defined as follows:

> "Business Income" means the:

---

[1] Operations is defined, in relevant part, as "[y]our business activities occurring at the 'premises'". Doc. 99-1 at 133. Suspension is defined, in relevant part, as "[t]he slowdown or cessation of your business activities."

[2] Doc. 99-1 at 128.

1

a. Net income (Net Profit or Loss before income taxes) that would have been earned or incurred; *and*,

b. Continuing normal operating expenses sustained, including payroll.[3]

In determining what constitutes a "loss" of Business Income, the Policy offers an exclusive list of factors that must considered:

3. <u>Loss Determination</u>

a. The amount of "Business Income" and "Rental Value" "loss" will be *determined based on*:

(1) The Net Income of the business before the direct 'loss' occurred;

(2) The likely Net Income of the business if no direct 'loss' had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume 'operations' with the same quality of service that existed just before the direct 'loss'; and

(4) Other relevant sources of information, including

(a) Your financial records and accounting procedures;

(b) Bills invoice and other vouchers; and

(c) Deeds, liens or contracts.[4]

Finally, the Policy explicitly provides for a reduction in losses, but only in certain circumstances. First, in the event "[a]ny Extra Expense … is paid for by other insurance," the amount of Extra Expense coverage will be reduced.[5] Second, in the event the Plaintiff is able to resume its business activities, its business income loss will be reduced by the revenue earned from the business activities, as provided in the below quoted paragraph:

c. <u>Resumption of Operations</u>

We will reduce the amount of your:

(1) "Business Income" "loss", other than Extra Expense to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged

---

[3] Doc. 99-1 at 132 (emphasis added).
[4] Doc. 99-1 at 129 (emphasis added).
[5] Doc. 99-1 at 129.

2

property (including merchandise and stock) at the "premises" or elsewhere.

(2) Extra Expense "loss" to the extent you can return "operations" to normal and discontinue such Extra Expense.[6]

Third, in the event the Plaintiff has "other insurance subject to the same plan, terms, conditions and provisions, Cincinnati's coverage is reduced proportionally. If there is other insurance, not subject to the same plan, terms, conditions and provisions, Cincinnati will only pay the "excess of the amount due from that other insurance."[7] Fourth, the Extra Expense coverage is reduced based on the salvage value of any property bought for temporary use during the resumption of operations.[8] Finally, the Policy contains an express endorsement related to terrorism coverage. That endorsement provides that "any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law." Cincinnati expressly disclaims that "we shall not be liable for the payment of any portion of the amount of such losses that exceeds" the amount available to the Plaintiff from the federal government.[9]

In contrast to these express reductions or limitations on Cincinnati's obligation to cover Plaintiff's losses, no Policy language explicitly permits Cincinnati to reduce the losses based on other taxpayer aid received by Plaintiff.

## EXPERT TESTIMONY

Plaintiff's forensic accounting expert, Kevin Grudzien, had determined that Plaintiff incurred $2,032,721[10] in lost Business Income due to the suspension of Plaintiff's business activities. (Ex. 1,

---

[6] Doc. 99-1 at 130.

[7] Doc. 99-1 at 92.

[8] Doc. 99-1 at 63.

[9] Doc. 99-1 at 10.

[10] This amount includes Mr. Grudzien's findings in his supplemental expert report served on Defendant on September 17, 2021. On September 28, 2021, this Court denied Defendant's motion in limine seeking to exclude this supplemental report. (Doc. 166). Pursuant to Defendant's response to Plaintiff's motion in limine No. 9 (Doc. 157 at 4-5), Plaintiff has agreed to reduce its damages by $18,262 because Cincinnati paid a lost business interruption claim under the Policy when Plaintiff's activities were suspended due to a civil authority order related to protests on the Plaza during the period of restoration.

3

Grudzien Dec. ¶ 3). As Mr. Grudzien explains, "general principle in determining losses due to a business interruption is to put the insured in the position it would have enjoyed if it had not been required to suspend its business activities." (*Id.* at ¶ 4). To do that, he performed the following general steps:

> The policy guidance, definitions, and requirements with regard to Business Income are not unique to this Policy. Instead, they are quite common. Most forensic accountants specializing in business interruption follow a similar approach in practice when calculating Business Income. That being, project the revenue that was reasonably expected to be generated during the Period of Restoration less the actual revenue that was generated during the Period of Restoration. This arrives at the calculated lost revenue.

> The same process occurs with all expenses from the operations, including payroll. Project the expenses that were estimated to be incurred during the Period of Restoration absent the loss incident less the actual expenses incurred during the Period of Restorations. The difference arrives at the expenses a business is able to avoid from the suspension of operations. These are commonly referred to as "non-continuing" expenses. To arrive at the Business Income amount, you subtract the avoided (non-continuing) expenses from the calculated lost revenue. This process indisputably follows the Policy guidance referenced above.

(*Id.* at ¶ 9). Mr. Grudzien's declaration describes, as an example, each step in the process for O'Dowd's. (*see id.* at ¶¶ 10-16).

Mr. Grudzien did not consider Plaintiff's receipt of taxpayer aid, (Ex. 2, Grudzien Dep. 67:2–69:5); (Grudzien Dec. ¶ 17), for several reasons. First, even though they were used to pay continuing expenses, the source of used to pay continuing expenses is irrelevant in any calculation of lost Business Income under the Policy[.]" (*Id.* at ¶ 18). Second, taxpayer aid was "not generated by Plaintiff's business activities (*e.g.,* food service, catering, alcohol sales, etc.)." (*Id.* at ¶ 19). "Like many other businesses, Plaintiff would have received the 2020 governmental loans even if it had not suffered an actual slowdown or cessation of its business. For this reason, the suggestion to offset the calculated Business Income amounts would penalize Plaintiff, transfer the benefit of loans to Defendant, and put Plaintiff in a worse position than other businesses that did not purchase Business Income coverage." (*Id.*) Third, the loans are not income and "[u]nder standard accounting practices, a loan forms no part of 'Net Income.'" (*Id.* at ¶ 20). Finally, to the extent the loans were forgiven, they were forgiven after the Period of Restoration; and,

4

in any event, were not generated by Plaintiff's business activities. (*Id.* at ¶ 21).

Cincinnati's expert, Mr. Schlader, offered a rebuttal report. Specifically, he criticized Mr. Grudzien for not offering a period of indemnity (restoration)[11] and for failing to consider taxpayer aid in calculating damages.[12]  But he had no other material disputes with the $1,727,739 in lost business income calculated at that time.  Ex. 4, Schlader Depo. 43:1-13.  As to the PPP money, Mr. Schlader did not testify or opine that the funds received were Net Income under the Policy.  Rather, he testified that the PPP funds "offset" the Plaintiff's ordinary operating expenses.  *Id.* at 76:1-23.

## ARGUMENT

Taxpayer aid should be excluded from evidence at trial because it is irrelevant under the Policy. There are four fundamental *and independent* reasons why the aid should be excluded. First, the Policy does not support Mr. Schlader's characterization that taxpayer aid is an offset to the actual ongoing business expenses sustained by the Plaintiff during the Period of Restoration. Second, the taxpayer aid was primarily in the form of government loans, which were booked as liabilities, not income, under ordinary accounting practices. They did not impact Plaintiff's income statements during the Period of Restoration. To the extent the loans were forgiven, they were not forgiven until May 2021, which is months after the end of the Period of Restoration—the only period relevant under the Policy. Thus, even if characterized as income when forgiven, the taxpayer aid is no more relevant than other income (or other losses) Plaintiff earned (or sustained) after the Period of Restoration. Third, if not excluded, Plaintiff will be placed in a *worse* position, not the same position, than it would have been if its business activities had not been suspended. As the Court has already held, Plaintiff would have been entitled to the aid even if there was no slowdown of its business activities. Crediting Cincinnati with the aid, thus,

---

[11] Schlader apparently failed to consider that the Policy provided a 12-month Period of Restoration.  He did not offer an opinion as to what an appropriate, alternative Period of Restoration should be. Ex. 4, Schlader Depo. at 51:18-21.

[12] He characterized any other criticisms of Mr. Grudzien's analysis as "immaterial," and he agreed that but for the two criticisms above, he does not dispute Mr. Grudzien's loss determination.  Ex. 4, Schlader Depo. at 42:23-43:13.

5

does not put Plaintiff in a better position but a worse position than it would have enjoyed without the insurance that Plaintiff purchased and paid for. Finally, the aid is barred by the collateral source rule, as Cincinnati is not entitled to have its coverage obligations bailed out by the U.S. taxpayers as it insists. Plaintiff paid for coverage and is entitled to what it paid for.

### A. The Terms of the Policy Do Not Permit Cincinnati an Offset for Taxpayer Aid Because the Aid is Not Business Income.

When Courts interpret an insurance policy, "[t]he plain language of the policy controls." *Brill as Tr. for Brill v. Mid-Century Ins. Co.*, 965 F.3d 656, 662 (8th Cir. 2020) (applying Minnesota law). This includes when and whether to apply a reduction in the coverage provided for by the policy. *See id.* (where UIM coverage provision in auto insurance policy established $250,000 UIM coverage limit and stated that insurer's "maximum [UIM coverage] is the amount of the *applicable limits less any amounts* recovered from any person . . . that may be legally responsible for the bodily injury or death for which the payment is made," and where underinsured motorist had paid decedent's spouse $103,000 to settle a resulting wrongful death suit, this settlement amount had to be deducted from $250,000 UIM coverage limit because "[t]he plain language of the policy controls, which dictates a limits-less-paid approach to calculating UIM coverage") (emphasis added). Accordingly, Missouri courts "[g]enerally . . . find definitions in an insurance policy to be controlling as to the terms used within the policy." *Bowan ex rel. Bowan v. Gen. Sec. Indemn. Co. of Arizona*, 174 S.W.3d 1, 5 (Mo. App. E.D. 2005) (citing *Polston v. Aetna Life Ins. Co.,* 932 S.W.2d 786, 788 (Mo. App. E.D. 1996)).

At summary judgment, the Court found as a matter of law that Plaintiff sustained an "actual loss" under the unambiguous terms of the Policy, despite the taxpayer aid Plaintiff received. (Doc. 155 at 19, 22) (framing the issue as "whether this relief precludes coverage" and finding that "the government relief Plaintiff received does not preclude coverage under the Policy"). This determination was correct: the Policy forecloses taxpayer aid being included as part of the lost Business Income calculus. Rather,

6

lost Business Income constitutes two components under the Policy: (1) the Net Income that would have been earned but for the suspension and (2) continuing normal operating expenses sustained.[13] Taxpayer aid is irrelevant to either determination. Indeed, Cincinnati's expert does not opine that the aid is either income or an expense. Rather, he opines that "the funds served as an offset of the expenses" and therefore should reduce the loss of Business Income. (*See* Ex. 4, Schlader Depo. 75-76). That characterization, however, should be excluded because it is inconsistent with the terms of the Policy.[14]

First, taxpayer aid is irrelevant because it was not income generated by the Plaintiff's operations; it was a government entitlement. The Policy promises that Cincinnati "will pay for the actual loss of 'Business Income' you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'"[15] Thus, the loss is defined by what Plaintiff sustained due to the necessary slowdown or cessation *of Plaintiff's business activities*.[16] Even if taxpayer aid were income (it is not, *see infra*), it was not income generated by Plaintiff's business activities (*i.e.,* it was not income from food or beverage sales or catering services). (*See* Ex. 4, Schlader Depo. at 64:7-22). The Policy, thus, does not contemplate consideration of income derived outside of Plaintiff's business activities; rather, it promises that Cincinnati will pay the entire loss of Business Income due to the slowdown of those activities. (*See* Grudzien Decl.

---

[13] Characterizing Plaintiff's "normal operating expenses" as an element of damages is a matter of semantics. In determining net income, it is necessary to project what Plaintiff's gross income would have been but for the suspension; then, gross income must be reduced by the projected expenses that Plaintiff would have incurred based on the assumption that those expenses were avoided during the period of suspension. But, as here, not all expenses were avoided; certain expenses (continuing expenses) were still sustained. They are, thus, added back to lost Business Income calculation (having been deducted as part of the projected but avoided expenses of Net Income) because they were not actually avoided. (*See* Grudzien Decl. ¶ 9).

[14] This opinion is also irrelevant under this Court's order on the parties' motions for summary judgment and according to defense counsel's own representations at the hearing on those motions. In its summary judgment order, the Court noted that "[i]n oral argument, Defendant clarified *it was not seeking a 'setoff'* but instead contends that Plaintiff has not sustained an 'actual loss' as required to establish Business Income coverage," and thus the Court found that it "need not address this issue." (Doc. 155 at 19 n.8) (emphasis added). The Court agreed with Plaintiff that "the purpose of the government relief was to keep workers paid and employed, not to compensate Plaintiff for its lost business income, and therefore Plaintiff still sustained an 'actual loss'" under the language of the Policy, (Doc. 155 at 19). The Court reasoned that "Plaintiff would have received the PPP loans regardless of whether Plaintiff had to suspend operations." (Doc. 155 at 21). Defendant's inconsistent positions are an attempt to avoid that it failed to actually plead a setoff defense in its Answer. (*See* Doc. 63)

[15] (Doc. 99-1 at 125).

[16] *See supra,* defining "suspension" and "operations" accordingly.

7

¶ 21).

Second, taxpayer aid is not part of the Net Income defined by the Policy. In fact, even Cincinnati's expert does not categorize it as "income" but insists it is an "offset" to expenses sustained. (*Id.* at 75-76). That is because Net Income is defined according to a *hypothetical* world: it is the "Net Income … that *would have been earned*" but for the suspension of Plaintiff's business activities.[17] Plainly, that requires a projection of sales based on Plaintiff's business activities less a projection of the costs that Plaintiff would have incurred to obtain those sales (*e.g.,* costs Plaintiff avoided because their business was suspended). This is further reflected in the Policy's "Loss Determination" paragraph, which requires that lost Business Income: "will be determined based on … Net Income of the business before the direct 'loss' occurred[,] likely Net Income of the business if no direct 'loss' had occurred[ and,] operating expenses, including payroll expenses, necessary to resume 'operations'[.]"[18] None of these factors even suggest consideration of any of Plaintiff's *actual* income during the Period of Restoration, including any taxpayer aid that was received. Indeed, the only actual, as opposed to hypothetical, revenue or income to be considered is the income "of the business *before* the direct 'loss' occurred."[19] (*Id.*) The Policy, therefore, requires Cincinnati to determine the *likely* Net Income of the business if no direct loss had occurred based on the financial records reflecting income earned prior to the loss. Taxpayer aid received during the Period of Restoration is neither.

Cincinnati, and its expert, are not free to consider factors absent from the Policy. Under controlling Eighth Circuit law, when an insurer promises that a calculation will be "based on" a list of factors—as Cincinnati did here—the insurer cannot consider unlisted factors to the detriment of the insured.[20] Yet,

---

[17] (Doc. 99-1 at 132) (emphasis added).

[18] (Doc. 99-1 at 129).

[19] (*Id.*).

[20] *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 763-64 (8th Cir. 2020) ("Looking at the language of the provision alone, we conclude that the phrase 'based on' is at least ambiguous because a person of ordinary intelligence purchasing an

that is what Cincinnati demands: it would have the Court rewrite the Policy and enforce an extracontractual limit on coverage that would "reduce the actual limits of coverage which the policyholder has purchased*." Shelter Mut. Ins. Co. v. Ganaway*, 694 S.W.2d 521, 522 (Mo. App. W.D. 1985) (rejecting insurer's attempt to reduce liability coverage limits under motorcycle policy by the amount of medical payment coverage under the policy). This is nothing more than "an attempt by [Cincinnati] to obtain a . . . windfall." *Id.* at 523.

Ordinary rules of contract construction further support the Plaintiff's reading. The Court must construe the language of the Policy to avoid rendering other provisions superfluous. *See, Gen. Am. Life Ins. Co. v. Barrett,* 847 S.W.2d 125, 133 (Mo. App. W.D. 1993) (applying canon of contract interpretation *expressio unius est exclusio alterius,* which "means that 'the expression of one thing is the exclusion of another' or 'the mention of one thing implies exclusion of another'"); *State ex rel. Blue Springs Sch. Dist. v. Grate*, 576 S.W.3d 262, 271 (Mo. App. W.D. 2019) (cleaned up) (quoting *Nooter Corp. v. Allianz Underwriters Ins. Co.*, 536 S.W.3d 251, 264 (Mo. App. E.D. 2017)) ("[W]e aim to give a reasonable meaning to every provision [of an insurance policy] and to avoid an interpretation that renders some provisions trivial or superfluous."); *Nautilus Ins. Co. v. Heartland Builders, LLC*, No. 219CV02624JARKGG, 2021 WL 929786, at *5 (D. Kan. Mar. 11, 2021) (alteration in original) (quoting *LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co.*, 36 Kan. App. 2d 853, 146 P.3d 1088, 1095 (2006)) (finding that under Kansas law "it is well established that 'judicial interpretation should not render any [contract] term meaningless.'"). While the Policy does not provide for consideration of taxpayer aid, it does provide for other reductions based on *specific* income actually earned. It states: Cincinnati will "reduce the amount of [Plaintiff's] 'Business Income' 'loss'" to the extent Plaintiff resumes operations in

---

insurance policy would not read the provision and understand that where the policy states that [amount] will be calculated 'based on' listed … factors that the insurer would also be free to incorporate other, unlisted factors into this calculation.").

9

whole or part.[21] It also provides that if Plaintiff has other insurance, Cincinnati will only pay the "excess of the amount due from that other insurance."[22] Taxpayer aid—whether a loan (like PPP) or grant (like some of the other forms of aid received) – is neither.[23] Yet, Cincinnati implicitly and improperly requests the Court write such a reduction into the Policy's terms. *See Crump v. State Farm Mut. Auto. Ins. Co*., 961 F.2d 725, 726 (8th Cir. 1992) ("the function of this Court is to interpret and enforce an insurance policy as written; not to rewrite the contract.").

Third, taxpayer aid does not fall within the second category of Business Income: it is not "continuing normal operating expenses sustained."[24] Cincinnati's expert appears to argue that taxpayer aid must be considered because Plaintiff used the funds to pay its continuing normal operating expenses. But how Plaintiff paid those expenses is irrelevant. The Policy necessarily contemplates that the expenses will be paid—*i.e.,* "sustained." (*See* Grudzien Decl. ¶ 18). If Plaintiff did not, or could not, obtain funding to pay the expenses, it would not have a claim under the Policy for these expenses because Plaintiff could not have "sustained" them. Schlader admitted, for example, that if Plaintiff's owners made "a capital infusion into the company to cover the ongoing expense during the period," such financing would not be an offset to Plaintiff's lost Business Income under the Policy.[25] Yet, he insists that taxpayer financing in the form of loans are an "offset" because the loans were (or, might be) later forgiven by the government. That, however, is just another way of attempting to characterize the aid as *actual* income that should reduce the Net Income loss of the Plaintiff. As explained above, there is no textual basis in the Policy to consider taxpayer aid as income: it was not generated by Plaintiff's business activities nor is it Net Income as the Policy defines that term.

---

[21] (Doc. 99-1 at 130).

[22] (Doc. 99-1 at 92).

[23] Cincinnati's expert admitted that none of the taxpayer aid constituted other insurance. Ex. 4, Schlader Depo. 92-93 (*e.g.,* "You would not consider the PPP first draw funds to be other insurance, would you? …A. Not that I'm aware of.").

[24] (Doc. 99-1 at 132).

[25] (Ex. 4, Schlader Depo. 84:9-21.)

10

Moreover, the Policy nowhere authorizes Cincinnati to "offset" any expenses sustained based on the source of the funding Plaintiff used to pay those expenses while Cincinnati improperly denied coverage. Most of the aid did not even appear on Plaintiff's income statement during the period of restoration because it consisted of loans, not income. (Ex. 3, Decl. of Kevin O'Brien at ¶ 19).

Construing the Policy as Cincinnati does would also violate the contract-construction principle set forth above. For example, the Policy provides for offsetting "[a]ny Extra Expense [that] is paid for by other insurance."[26] It also provides for offsetting any Extra Expense for property bought for temporary use during the period of restoration based on the salvage value of that property.[27] It does not provide, however, that any portion of the "continuing normal expenses" sustained be subject to *any* offset, much less taxpayer aid like the loans provided to the Plaintiff.

In sum, the Policy sets forth what can be considered to calculate lost Business Income, but Cincinnati cannot offer an interpretation that permits taxpayer aid to inure to the insurance company's benefit. For this reason alone, the evidence should be excluded as irrelevant and unduly prejudicial.

### B. Loans Forgiven After March 23, 2021 are Irrelevant Because They Are Outside the Period of Restoration.

Even if taxpayer aid could generally be considered an offset to lost Business Income, the aid here must be excluded because the income was not realized until after the Period of Restoration. The Policy unambiguously ensures coverage only "during the 'period of restoration.'"[28] The Policy also unambiguously fixes the method for determining "[t]he amount of 'Business Income' . . . 'loss.'"[29] None of the loans received by Plaintiff represented income during the Period of Restoration as defined under

---

[26] Doc. 99-1 at 129.
[27] Doc. 99-1 at 63.
[28] Doc. 99-1 at 62.
[29] (Doc. 99-1 at 77).

the Policy.[30] Pursuant to the Policy, the period of restoration is no more than 12 months from the date of "loss."[31] It ended during the March 2021 fiscal period. Although Plaintiff received the first PPP loans in April 2020,[32] those loans were not income and, correctly, did not appear on Plaintiff's income statement.[33] Loans are treated as liabilities, not income, under common accounting practices. (O'Brien Decl. ¶ 6). As such, Plaintiff accounted for the loans it received as liabilities, shown as notes payable in Plaintiff's financial statements. (O'Brien Decl. ¶ 7). In fact, the PPP loans carried an interest rate of one percent and matured in two years; although, the interest and loan payments were deferred during the pandemic.[34] (O'Brien Decl. ¶ 7). Only if Plaintiff met certain requirements, including strict use restrictions, could they apply for forgiveness of the loans. After meeting those requirements, in April 2021, Plaintiff applied to have the first round of PPP loans forgiven; and, those loans were forgiven on or about May 3, 2021. (*Id.* at ¶ 9). Under ordinary accounting practices, only then was the forgiven amount recorded as income. (*Id.*).

Income recorded in May 2021 is irrelevant because that is outside the Period of Restoration under the Policy. The Policy obligates Cincinnati to pay only for losses sustained "during the 'period of restoration.'"[35] As such, Plaintiff cannot include lost Business Income sustained after the Period of Restoration; by the same token, Cincinnati cannot rely on any income that is booked after that period.

---

[30] Cincinnati's damages expert has acknowledged that these loans reflected a liability, not income. (*See* Schlader Supp. Report at 1, attached as Exhibit 5.)

[31] (Doc. 99-1 at 87 (subsection D.b.3)); (Doc. 99-1 at 42-43 ("12 MONTHS ALS")).

[32] Plaintiff did not receive the second round of PPP loans until March 2, 2021; thus, even under Cincinnati's "offset" theory, the second PPP loans were used to pay continuing expenses, including payroll, that are almost entirely outside the Period of Restoration and thus could not have "offset" Plaintiff's expenses sustained during the Period of Restoration. (*See* O'Brien Decl. ¶ 11). Moreover, these loans have not been forgiven and thus, even today, have not been recorded as income. Permitting the jury to hear about them would, therefore, be prejudicial and confusing.

[33] (O'Brien Decl. ¶¶ 4-13). Cincinnati has, at times, also referenced $1,402,300 in SBA disaster relief received by Plaintiff, but these are loans that carry an interest rate and must be repaid. (O'Brien Decl. ¶ 13). Cincinnati has never articulated an argument for treating these funds as an offset.

[34] *See* https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/first-draw-ppp-loan#section-header-2, attached as Exhibit 8.

[35] (Doc. 99-1 at 125).

12

The Policy simply does not permit that under any reasonable interpretation.[36]

### C. Excluding Evidence of Taxpayer Aid is Necessary to Prevent Plaintiff From Being Penalized for Seeking Taxpayer Aid.

The crux of Cincinnati's argument—and case law—is that the Plaintiff should not be put in a better position than it would have been if its business activities had not been suspended. Excluding evidence of taxpayer aid, however, does exactly that: it makes Plaintiff whole and no more.

As the Court found in its order regarding summary judgment, "Plaintiff would have received the PPP loans regardless of whether Plaintiff had to suspend its operations." (Doc. 155 at 21).[37] Like many businesses, Plaintiff would have been entitled to the PPP loans even if it had not been required to suspend its business activities. (*See* Grudzien Decl. ¶ 19). Such a suspension was not a pre-requisite to the aid: Plaintiff only had to certify that the "[c]urrent economic uncertainty makes [Plaintiff's] loan request necessary to support the ongoing operations of the Applicant."[38] And to receive forgiveness, Plaintiff only needed to comply with the use requirements for the funds. Thus, to be made whole, Plaintiff must receive both its lost Business Income due to the suspension *and* the aid.

In contrast, Plaintiff is not "better off," as Cincinnati would have it, if it received both its lost Business Income and the aid. Plaintiff would have received both the aid and its ordinary business income if it had not been required to suspend its business activities due to the physical loss or damage at its property. Rather, Cincinnati seeks to penalize Plaintiff, transfer the benefit of the loans to itself, and make Plaintiff worse off than other businesses that did not purchase Business Income coverage.

---

[36] To the extent the Policy is subject to reasonable debate on this issue, such an ambiguity must be construed against Cincinnati. *See Vogt*, 963 F.3d at 763-64.

[37] As the Small Business Agency's FAQ sets forth: "Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant. Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business." *See* https://www.sba.gov/sites/default/files/2021-07/FINAL%20FAQ%20Update%207.29.21-508.pdf, attached as Exhibit 6.

[38] Ex. 7 (Trial Ex. 244).

13

(Grudzien Decl. ¶ 19).

Moreover, the Policy, as a whole, does not support such a transfer of the benefits of taxpayer aid to the insurance industry. First, as noted above, while the Policy contemplates offsets (or reductions) based on other sources of funds, it is silent as to taxpayer aid. Second, the Policy specifically addresses at least one other forms of government-supported insurance coverage, but it is unrelated to the taxpayer aid provided here. Specifically, the U.S. government created a pooled source of insurance for certified terrorism-related acts; and, the Policy specifically addresses how a recovery under the government-provided insurance reduces or limits Cincinnati's obligations under the Policy. (*See* Doc. 99-1 at 10 ("losses caused by certified acts of terrorism would be partially reimbursed by the United States Government," and Cincinnati's obligations, even if coverage were triggered by the Policy, are reduced)). Here, however, the U.S. government did not bail out the insurance industry by creating a government insurance pool; and, the Policy's terms do not cover the specific aid obtained by Plaintiff. Thus, it is clear that the government was providing aid to the taxpayer, not Cincinnati, and the Policy does not permit the offset Cincinnati claims.

### D. The Collateral Source Rule Also Bars Evidence of Taxpayer Aid.

Lastly, another reason the evidence of taxpayer aid should be excluded is that the payments are barred by the collateral source rule. As shown in Plaintiff's Motion *in Limine* No. 1 (Doc. 128), which is incorporated herein by reference, evidence of taxpayer aid is precluded by the collateral source rule. The collateral source rule applies "either when the payment in question came from a source wholly independent of the liable party *or* when the plaintiff may be said to have contracted for the prospect of a 'double recovery.'" *Overton v. U.S.,* 619 F.2d at 1306 (8th Cir. 1980) (applying Missouri law); (emphasis added); *see also v. Milburn Enterpr., Inc.,* 233 P.3d 205, 223 (Kan. 2010). As explained in the MIL, the taxpayer aid provided by state and local governments came from a source wholly independent of Cincinnati (Doc. 128 at 5); and applying the collateral source rule comports with the rule's underlying rationale.

Additionally, in a sense, Plaintiff contracted with Cincinnati for the prospect of a "double recovery" in that it paid Cincinnati premiums for business-interruption coverage. Although Plaintiff suffered losses and the government assisted Plaintiff in paying the continuing business expenses it sustained during the suspension, the insurer unreasonably refuses to pay Plaintiff its contracted-for insurance benefits. The collateral source rule precludes Cincinnati from taking an effective windfall, at Plaintiff's expenses, when it accepted the benefits of Plaintiff's premiums without providing coverage. Doing so would encourage insurance companies to deny coverage under pandemic-type circumstances while public policymakers consider whether to provide aid.

Cincinnati has argued that the collateral source rule does not apply because it was not a "wrongdoer" who caused Plaintiff's losses. To be sure, cases applying the collateral source rule, including those cited by Plaintiff, speak in terms of a "wrongdoer" not benefitting from a compensation source that is wholly independent of the wrongdoer. *See, e.g.., Overton,* 619 F.2d at 1306. However, none of the cases *limit* the collateral source to that circumstance; and, Cincinnati cites no authority that the collateral source rule does not apply even if Cincinnati is not considered a "wrongdoer" by having denied the contracted-for benefits of Plaintiff's insurance policy. In fact, *Overton* leaves open the possibility that the collateral source rule may be applied in this situation. *Overton* noted that the underpinning of the rule is to do "substantial justice." *See id.* Moreover, as described above, the other rationale for the collateral source rule is that "the plaintiff deserves any additional compensation he may receive because he has 'contracted' for it, because it is in the nature of insurance.'" *Id.* This second rule does not require that Cincinnati be a wrongdoer; only that Plaintiff contracted for the additional compensation.

Accordingly, under the collateral source rule, the government benefits Plaintiff received do not relieve Cincinnati of its obligation to pay Plaintiff for the actual loss it sustained.

The cases Cincinnati cites as "analogous" are inapposite. None address whether *government-provided aid during a time of national disaster* or similar collateral source reduces or eliminates a

15

plaintiff's actual loss. They simply stand for the unremarkable proposition that income an insured earns during a business interruption period offsets its losses. *See Boardwalk Apts, L.C. v. State Auto Prop. & Cas. Ins. Co.,* 11 F. Supp. 3d 1062, 1091 (D. Kan. 2014), *rev'd and remanded on other grounds,* 816 F.3d 1284 (10th Cir. 2016) (interest income from investment of insurer's advance payment reduced plaintiff's actual loss); *Polymer Plastics Corp. v. Hartford Cas. Ins. Co.,* 2006 WL 8429774 (D. Nev. Sept. 26, 2006), *order clarified,* 2006 WL 8429765 (D. Nev. Nov. 14, 2006), *aff'd,* 389 F. App'x 703, 705 (9th Cir. 2010) (gross income plaintiff received from partial resumption of operations must be deducted from plaintiff's net income plus continuing operating expenses); *Eidelman v. State Farm Fire & Cas. Co.,* 2011 WL 198501 (E.D. Pa. June 19, 2011) (revenue plaintiff generated from operations at temporary office space offset its losses).

Cincinnati has also attempted to distinguish the cases cited by Plaintiff on summary judgment as involving government programs with a right of subrogation against any insurance proceeds. But Cincinnati has not shown that the government will *not* seek common-law subrogation in the event the insurance industry lives up to its Policy obligations either by future action or by a common-law right of subrogation.

In short, Cincinnati seeks to shift the costs of the pandemic—even where a business paid to insure covered losses like these—*to the taxpayers*. That is inappropriate.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court exclude all evidence, argument, or reference to all taxpayer aid, including PPP, grants, and other loans provided to Plaintiff during the pandemic.

16

Respectfully submitted by:

**STUEVE SIEGEL HANSON LLP**

 /s/ Patrick J. Stueve
Patrick J. Stueve, MO #13847
Bradley T. Wilders, MO #78301
Curtis Shank, MO #66221
Abby E. McClellan, MO #66069
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:  816-714-7100
Facsimile:  816-714-7101
Email: stueve@stuevesiegel.com
Email: wilders@stuevesiegel.com
Email: shank@stuevesiegel.com
Email: mcclellan@stuevesiegel.com

**LANGDON AND EMISON LLC**

J. Kent Emison, MO #29721
Brett A. Emison, MO #52072
Patricia L. Campbell, MO #60917
911 Main Street
Lexington, Missouri 64067
Telephone: 660-259-6175
Facsimile:  660-259-4571
Email: brett@lelaw.com
Email: kent@lelaw.com
Email: tricia@lelaw.com

**MILLER SCHIRGER LLC**

John J. Schirger, MO # 60583
Matthew W. Lytle, MO #59145
Joseph M. Feierabend, MO #62563
4520 Main Street, Suite 1570
Kansas City, Missouri 64111
Telephone:    816-561-6500
Facsimile:    816-561-6501
Email: jschirger@millerschirger.com
Email: mlytle@millerschirger.com
Email: jfeierabend@millerschirger.com

**SHAFFER LOMBARDO SHURIN, P.C.**

17

Richard F. Lombardo, MO #29748
2001 Wyandotte Street
Kansas City, Missouri 64108
Telephone:    816-931-0500
Facsimile:    816-931-5775
Email: rlombardo@sls-law.com
*Attorneys for Plaintiff*

18