**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

K.C. HOPPS, LTD.,

      Plaintiff,

v.

THE CINCINNATI INSURANCE COMPANY,

      Defendant.

Case No. 4:20-CV-437-SRB

## PLAINTIFF'S MOTION FOR A NEW TRIAL AND SUGGESTIONS IN SUPPORT

Cincinnati invited a series of related errors at trial and then intentionally capitalized upon those errors during closing arguments to obtain a defense verdict that is contrary to the law and evidence adduced at trial. Plaintiff respectfully seeks a new trial for the following reasons.

*First*, Cincinnati invited several instructional errors that both individually, and collectively, misled the jury, calling the verdict into serious doubt. The Court submitted jury instructions based on the Ordinance or Law and Acts or Decisions policy exclusions even though there was no evidence supporting application of those exclusions. The only alleged "ordinance", "law", "act", or "decision" (hereinafter, "excluded occurrence[s]") ever mentioned by Cincinnati were the government orders impacting Plaintiff's business operations due to SARS-CoV-2. But it is legally undisputed that the excluded occurrences only operate to bar coverage if they cause or contribute to the *physical* loss or damage to Plaintiff's properties. And it was factually undisputed at trial that the government orders did not cause or contribute to any such physical loss or damage. In fact, they were intended to mitigate the physical loss or damage caused by SARS-CoV-2 by slowing its spread throughout the Kansas City metropolitan area. Moreover, Cincinnati also failed

to adduce any competent evidence that the government orders were actually "ordinances" or "laws." The only evidence in the record is that they were temporary orders issued by local health officials, not enactments of any legislative body. The jury's conclusion was, therefore, based on pure and impermissible speculation, not evidence. To make matters worse, Cincinnati also invited the Court to instruct the jury that "all" words in the policy be given the plain and ordinary meaning even though the policy specifically instructs that some words have a "special meaning" as set forth in the policy. The critical term at issue at trial—"loss"—was used in Cincinnati's insurance policy both as a defined term with a "special meaning" and as an undefined term subject to it plain and ordinary meaning. Cincinnati's proposed instructions made sure the jury was never instructed on this crucial distinction. Lastly, Cincinnati opposed including a contributing cause instruction in the verdict director and damages instruction even though the law is clear that when there are two potential causes, such an instruction is required. Because instructions must be supported by substantial evidence and correctly state the law, these were legal errors that necessitate a new trial.

*Second*, these errors were not harmless. Cincinnati exploited these instructional errors during closing arguments to conflate *financial* loss with *physical* loss, bootstrapping the anti-concurrent cause language of the Ordinance or Law exclusion into an argument that Plaintiffs could not recover any financial loss indirectly caused by the government orders. But the Ordinance or Law exclusion only applies to physical losses—precisely the opposite of what Cincinnati argued to the jury: "those orders and the fact that they're even part of the cause of their claimed ***financial*** loss ***means that this exclusion applies***." Trial Tr. vol. 3, 629:19–21 (emphasis added). While Cincinnati's arguments were legally incorrect, that fact was obscured by the other instructional errors, including the failure to include contributing-cause language in the verdict director or to that the word "loss" is narrower for the exclusions than it is for purposes of business income damages.

*Third*, due to the errors invited by Cincinnati, the subsequent verdict is against the weight of the evidence. On all the key points, the evidence was tilted heavily in Plaintiff's favor. No defense expert disagreed with Dr. Goodman's testimony that the virus was present, and all the experts agreed that SARS-CoV-2 physically contaminates and alters property when present. Only causation was clearly disputed at trial but that was precisely the issue on which Cincinnati misled the jury by conflating its burden to show *physical* loss or damage, under the exclusions, with Plaintiff's burden to show SARS-CoV-2 was a mere cause of Plaintiff's *financial* losses (as opposed to the sole cause).

*Fourth*, the Court should not have excluded evidence about the Insurance Service Office ("ISO") virus exclusion, made available to Cincinnati for its policies in or around 2006. After the pandemic started, Cincinnati's leaders internally acknowledged that SARS-CoV-2 could cause physical loss or damage to property and trigger coverage under the policy. This was not extrinsic evidence to interpret the policy but evidence refuting a key factual issue in the case—whether the presence of the virus on an insured's property met the physicality requirement of the policy.

*Finally*, the foreperson of the jury should not have been seated. During voir dire, she openly admitted to being possibly biased and likely unable to set aside her personal accounting expertise and decide the case on the evidence. Taken together with these other issues, that error also clearly justifies giving Plaintiff a new trial.

## TABLE OF CONTENTS

LEGAL STANDARD ............................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.  CINCINNATI INVITED ERRONEOUS JURY INSTRUCTIONS. ...................................... 3

   A.  The Exclusions Should Not Have Been Given to the Jury Because There Was No
      Evidence to Support that the Excluded Occurrences Caused *Physical* Loss or Damage
      as Required by the Policy. ................................................................................................ 3

      1.  Legal standard. ......................................................................................................... 3

      2.  Procedural history of the exclusion-based instructions. .................................................. 3

      3.  The instructions were not supported by evidence and should not have been given
         because the government orders could not have caused or contributed to the presence
         of SARS-CoV-2. ........................................................................................................ 6

   B.  Instruction 20 Should Have Directed the Jury to Give Defined Terms Under the
      Policy the "Special Meaning" Dictated by the Policy. ....................................................... 10

      1.  Procedural history. ................................................................................................... 10

      2.  Instruction 20 was legally inaccurate because it conflicted with the policy. ................. 11

   C.  Cincinnati Also Invited Error by Refusing to Agree to a Contributing Cause
      Instruction in the Verdict Director and Damages Instructions. ........................................ 13

      1.  Procedural history. ................................................................................................... 13

      2.  Failing to include the contributing-cause language was error invited by Cincinnati. .. 14

II.  CINCINNATI IMPROPERLY URGED THE JURY TO FIND THE EXCLUSIONS
    APPLICABLE EVEN IF THEY DID NOT CAUSE *PHYSICAL* LOSS OR DAMAGE. ... 17

   A.  Cincinnati Conflated Physical and Financial Loss To Nullify the Physical Loss
      Requirement of the Exclusions. ....................................................................................... 17

   B.  Based on Cincinnati's Misuse of Instruction 21, the Verdict Was Against the Weight
      of the Evidence. ............................................................................................................. 22

III. THE COURT SHOULD NOT HAVE EXCLUDED EVIDENCE OF THE VIRUS
    EXCLUSION. ...................................................................................................................... 25

IV. THE COURT SHOULD HAVE STRUCK THE JURY FOREPERSON. ......................... 26

CONCLUSION .................................................................................................................. 28

# TABLE OF AUTHORITIES

Cases

*Aetna Cas. & Sur. Co. v. Yeatts*,
  122 F.2d 350 (4th Cir. 1941) ........................................................................ 1, 2, 22

*Allen v. Brown Clinic, P.L.L.P.*,
  531 F.3d 568 (8th Cir. 2008) ................................................................................ 26

*Allied Chemical Corp. v. Daiflon, Inc.*,
  440 U.S. 33 (1980) .................................................................................................. 1

*Blackorby v. BNSF Rwy. Co.*,
  849 F.3d 716 (8th Cir. 2017) ................................................................................ 17

*Brownstein v. Rhomberg-Haglin & Assocs., Inc.*,
  824 S.W.2d 13 (Mo. banc 1992) ..................................................................... 14, 15

*Carlson v. K-Mart Corp.*,
  979 S.W.2d 145 (Mo. banc. 1998) .................................................................. 14, 16

*Dubuque Fire & Marine Ins. Co. v. Caylor*,
  249 F.2d 162 (10th Cir. 1957) .............................................................................. 16

*Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*,
  506 F. Supp. 3d 360 (E.D. Va. 2020) ..................................................................... 8

*Ford v. GACS, Inc.*,
  265 F.3d 670 (8th Cir. 2001) .................................................................................. 3

*Gasperini v. Ctr. For Humanities, Inc.*,
  518 U.S. 415  (1996) ............................................................................................... 1

*Goff v. Carpenter*,
  No. CIV. 06-2023, 2007 WL 1321798, at *1 (W.D. Ark. May 4, 2007) ............... 12

*Graybar Elec. Co. v. Fed. Ins. Co.*,
  No. 4:06 CV 1275 DDN, 2007 WL 1365327 (E.D. Mo. May 9, 2007) .................. 15

*J.C. Carlile Corp. v. Farmers Liquid Fertilizer, Inc.*,
  346 F.2d 91 (8th Cir. 1965) .................................................................................. 11

*John Drennon & Sons Co. v. New Hampshire Ins. Co.*,
  637 S.W.2d 339 (Mo. Ct. App. 1982) .............................................................. 14, 15

*Keil v. Lopez*,
  862 F.3d 685 (8th Cir. 2017) ................................................................................ 10

*Larson by Larson v. Miller*,
  76 F.3d 1446 (8th Cir. 1996) .................................................................................. 8

*Lockhart v. United States*,
  834 F.3d 952 (8th Cir. 2016) ................................................................................ 14

v

*Moran v. Clarke*,
    443 F.3d 646 (8th Cir.2006) ........................................................... 26

*Oral Surgeons, P.C. v. The Cincinnati Ins. Co.*,
    2 F.4th 1141 (8th Cir. 2021) ...................................................... 3, 6

*Oswald v. Bertrand*,
    249 F. Supp. 2d 1078 (E.D. Wis. 2003) ........................................... 28

*Slatton v. Martin K. Eby Const. Co., Inc.*,
    506 F.2d 505 (8th Cir. 1974) .................................................. 1, 2, 3

*In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*,
    521 F. Supp. 3d 729 (N.D. Ill. 2021) ............................................. 13

*United States v. Sithithongtham*,
    192 F.3d 1119 (8th Cir. 1999) ....................................................... 27

*Warren v. State Farm*,
    531 F.3d 693 (8th Cir. 2008) ..................................................... 3, 7

Other Authorities

58 Am. Jur. Proof of Facts 3d 395 ........................................................ 26

MAI 19.01 ...................................................................................... 14

## LEGAL STANDARD

The authority to grant a new trial is "confided almost entirely to the exercise of discretion" of the trial court. *Allied Chemical Corp. v. Daiflon, Inc.*, 440 U.S. 33, 36 (1980). Indeed, "[o]n such a motion *it is the duty* of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict… will result in a miscarriage of justice." *Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 352 (4ᵗʰ Cir. 1941) *overruled on other grounds by Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415 438-39 (1996). This exercise of power "is not in derogation of the right of trial by jury but is one of the historic safeguards of that right." *Id. See also Slatton v. Martin K. Eby Const. Co., Inc.*, 506 F.2d 505, 508 (8ᵗʰ Cir. 1974) (quoting *Aetna*). Because granting a new trial rests in the sound discretion of the trial judge, it is not reviewable on appeal except for the most extraordinary circumstances. *Id.* at 354.

In *Aetna*, the court examined closely the court's duty to grant a new trial when justice required it to do so:

> "Trial by jury" therefore meant, at the time of the Magna Carta, the investigation and decision of an issue of fact between parties litigant by 12 men, sitting as jurors, under the advice and legal direction of a law judge. When the verdict is rendered by the jury, it is to the court of which they are a part. It is recorded upon the minutes of the court, and becomes a part of the record of the trial; but it does not thereby become a judgment of the court, unless the judge is satisfied with it, and specially or by general order or rule so directs. *He has a responsibility for the result no less than the jury, for it is his duty to see that right and justice are done*, so far as this may be practicable in the particular case. *If he is not satisfied with the verdict, it is his duty to set it aside, and grant a new trial before another jury*. This was the settled practice in England as early as 1665….
>
> …. The jury are to try the cause with the assistance of the judge. They are not, and have never been, independent of the court of which they are a part, but their verdicts must meet the approval, or at least they must not offend the sense of justice, of the presiding judge, who, as the last Justice Grier, of the supreme court of the United States, was fond of saying, was by virtue of his position, "the thirteenth juror."

*Id.* (internal citation omitted) (emphasis added).

1

Expounding on the trial court's duty to grant a new trial when justice requires, the Court continued and emphasizing the concern that the jury makes a mistake of law due to a confusing presentation, the court continued:

> Trials by jury in civil causes, could not subsist without a power, somewhere to grant new trials. There are numberless causes of false verdicts, without corruption or bad intention of the jurors. They may have heard too much of the matter before the trial; and imbibed prejudices without knowing it. The cause may be intricate; the examination may be so long as to distract and confound their attention. Most general verdicts include legal consequences as well as proposition of fact: in drawing these consequences the jury may mistake, and infer directly contrary to law. The parties may be surprised by a case falsely made at the trial, which they had no reason to expect, and therefore could not come prepared to answer. If unjust verdicts obtained under these and a thousand like circumstances, were to be conclusive forever, the determination of civil property, in this method of trial, would be very precarious and unsatisfactory. It is absolutely necessary to justice, that there should, upon many occasions, be opportunities of reconsidering the cause by a new trial.
>
> …
>
> To the federal trial judge, the law gives ample power to see that justice is done in causes pending before him; and the responsibility attendant upon such power is his in full measure. *While according due respect to the findings of the jury, he should not hesitate to set aside their verdict and grant a new trial in any case where there ends of justice so require*.

*Id.* at 353-54 (internal quotation and citation omitted) (emphasis added).

The decision of the trial court not to grant a directed verdict on an issue will not prohibit the court from granting a new trial on the same issue because the standards are different. *Id.* at 354. A judge may not direct a verdict even where there is substantial evidence in support of a plaintiff's case and instead defer to the "jury to weigh the evidence and pass upon its credibility." *Id.* However, the judge may "set aside a verdict supported by substantial evidence where in his opinion it is contrary to the clear weight of the evidence, or is based upon evidence which is false; for, even though the evidence be sufficient to preclude the direction of a verdict, *it is still his duty*

2

*to exercise his power over the proceedings before him to prevent a miscarriage of justice*." *Id.* (emphasis added).

## ARGUMENT

## I. CINCINNATI INVITED ERRONEOUS JURY INSTRUCTIONS.

### A. The Exclusions Should Not Have Been Given to the Jury Because There Was No Evidence to Support that the Excluded Occurrences Caused *Physical* Loss or Damage as Required by the Policy.

#### 1. Legal standard.

"To be charged to the jury, an issue submitted in an instruction must be supported by substantial evidence from which the jury could find such issue." *Ford v. GACS, Inc.,* 265 F.3d 670, 679 (8th Cir. 2001). *See also Warren v. State Farm*, 531 F.3d 693, 699 (8th Cir. 2008) (without evidence to support an insurance carrier's affirmative defense, no reasonable jury could find the affirmative defense to apply).

#### 2. Procedural history of the exclusion-based instructions.

According to the plain language of the policy, neither exclusion applies unless the excluded occurrence causes a "loss" to the Plaintiff. *See* Trial Ex. 234A at 17, 22, attached as Exhibit A. "[L]oss" is defined under the policy as "accidental physical loss or accidental physical damage." Based on the construction of the phrase applied in *Oral Surgeons*, there must be "physicality to the loss or damage to the property." *Oral Surgeons, P.C. v. The Cincinnati Ins. Co.*, 2 F.4th 1141, 1144 (8th Cir. 2021). Physicality means "physical contamination, physical alteration, or physical destruction" of the property. *Id.* at 1144. A mere "loss of use" due to restrictions imposed by government orders does not satisfy the physicality requirement. *Id.* at 1145.

Advancing the government orders as the only purported excluded occurrence, Cincinnati moved for summary judgment based on the Ordinance or Law and Acts or Decisions exclusions.

3

(Doc. 98 at 19-20) ("Plaintiff's alleged loss derives from the orders [and] [t]he orders were ordinances or law. Accordingly, there is no coverage."). In direct contravention of *Oral Surgeons,* Cincinnati specifically argued that the excluded occurrences caused a "loss of use of [Plaintiff's] premises[.]" *Id.* ("The record demonstrates that Plaintiff's alleged *loss of use of its premises* was caused by or resulted from the Orders. Accordingly, the exclusion applies and there is no coverage.").

Plaintiff devoted seven pages of its summary judgment opposition responding to Cincinnati's arguments about the exclusions, including arguing that Cincinnati conflated financial loss with physical loss. (Doc. 108 at 19-25). In a succinct—but entirely correct analysis—the Court applied the definition of "loss" as defined by *Oral Surgeon's* and rejected Cincinnati's argument that the government orders could trigger the exclusions because "[t]he record does not show that these exclusions 'caused' SARS-CoV-2 to enter Plaintiff's premises. In turn, these exclusions do not apply to Plaintiff's claims." (Doc. 155 at 23).

Relying on the Court's statement that the exclusions "do not apply to Plaintiff's claims[,]" Plaintiff did not anticipate that these exclusions would be at issue during the trial. (*See* Pretrial Conf. Tr., Doc. 179 at 38:10-18). Yet, on the eve of jury selection, Cincinnati moved the Court to reconsider the applicability of the exclusions. (Doc. 207 at 2). In contravention of *Oral Surgeons,* Cincinnati again pointed to the various "COVID-19 related orders" as the allegedly excluded occurrence that resulted in loss of use of Plaintiff's properties. (Doc. 207 at 3-4). It did not point to any physical damage or loss but again insisted that because the "orders resulted in the complained-of interruption to Plaintiff's business the exclusion should be submitted to the jury." (*Id.* at 4). In other words, Cincinnati suggested that the exclusions applied so long as the orders caused the business interruption (*e.g.,* financial loss)—the exact argument rejected in *Oral*

4

*Surgeons* when the Eighth Circuit considered whether the insured could prove "loss" under the policy based on a loss of use due to the government orders. Cincinnati's argument was not grounded in the language of the policy itself or any other supporting evidence; and, Cincinnati later abandoned that contention by agreeing the jury instructions should include language that the exclusions required *physical* loss or *physical* damage. Trial Tr. vol. 2, 195:15-197:1

Without taking further argument from Plaintiff, the Court denied Plaintiff's request to exclude reference to these exclusions based on unidentified "material issues of fact [that] exist regarding the exclusions." (Doc. 213 at 1). But no issues of fact (other than the orders) were ever alleged or entered into evidence.[1]

Cincinnati proposed a jury instruction for both exclusions that did not limit the them to physical loss or damage. (*See* Doc. 167 at 16, 20). Plaintiff objected to these instructions based on the Court's summary judgment order and because the instruction "misstates the requirements, provisions, and terms of the insurance policy," and contended no instruction on the exclusions was warranted. (*See* Doc. 170 at 5, 8). At the instruction conference, Cincinnati ultimately agreed that the exclusions must include language requiring that the jury find one of the excluded occurrences cause *physical* loss or *physical* damage. Trial Tr. vol. 2, 195:15-197:1; (Doc. 239 at 30-31).

---

[1] Perhaps the Court's concern at this time was ensuring Cincinnati had the ability to argue its causation defense that Plaintiff's damages resulted solely from governmental orders and not from physical alteration or physical contamination of Plaintiff's property by SARS-CoV-2. But the Court eliminated that concern when it instructed the jury that Plaintiff must prove that the (financial) "loss of business income due to the necessary suspension of the plaintiff's operations [must be] caused by direct physical loss or physical damage to plaintiff's properties." (Doc. 239 at 32). The Court may, thus, have found sufficient record evident to raise a genuine issue of material fact regarding whether Plaintiff met its burden for proving its lost business income was caused by the contamination, but that was a distinct issue from whether the elements of the exclusion applied because the exclusion required *physical* loss or damage.

5

Despite that concession, Cincinnati did not adduce any evidence (or even argue) that the government orders resulted in anything physical. Plaintiff timely objected to the submission of Jury Instruction Nos. 21 (Ordinance or Law) and 22 (Acts or Decisions) on the grounds that they were not supported by *any* evidence that any excluded occurrence caused or contributed to the presence of SARS-CoV-2 on Plaintiff's property. Trial Tr. vol. 3, 523:21-524:23, 567:2-13. Plaintiff also moved for judgment as a matter of law based on Cincinnati's failure to adduce any evidence that these exclusions apply. (Doc. 234 at 1) ("Cincinnati has not attempted to link its exclusions to any physicality of loss."). The Court denied the motion and submitted the instructions. As explained below, Cincinnati then used the instructions to improperly argue that they were triggered by financial loss, not physical loss.

> **3. The instructions were not supported by evidence and should not have been given because the government orders could not have caused or contributed to the presence of SARS-CoV-2.**

Instructions Nos. 21 and 22 were not supported by any evidence, much less the substantial evidence, required to permit their submission to the jury.

*First*, and most importantly, Cincinnati only ever pointed to the government orders resulting in a loss of use as the excluded occurrences. But *Oral Surgeons* held that a "mere loss of use" due to such orders was insufficient to show the requisite physicality of loss or damage. *Oral Surgeons*, 2 F.4th at 1144. Further, the one health order admitted into evidence at trial fails to raise even a scintilla of an inference of evidence that the order caused physical loss or damage by the SARS-CoV-2. *See* Trial Ex. 52A, attached as Exhibit B. To the contrary, the express purpose of that Emergency Order of Local Health Officer was to *reduce* the spread of COVID-19 and protect the "health, safety, and welfare of persons *and property*" in Johnson County, Kansas. *Id.* (emphasis added). Cincinnati cannot point to anything at trial that suggests this or any other

6

government order caused SARS-CoV-2 to physically contaminate or alter Plaintiff's properties in any way. Such a proposition would, in fact, be absurd because the stated purpose of the order was to *prevent* the spread of the SARS-CoV-2 virus.

This issue is similar to that addressed by the Eighth Circuit in *Warren v. State Farm*, 531 F.3d 693 (8th Cir. 2008). Ms. Warren sued State Farm for insurance proceeds following a fire that destroyed her home. *Id.* at 695. State Farm asserted an affirmative defense that Ms. Warren had made material misrepresentations following the loss, that voided her coverage. *Id.* at 695-696. The district court granted a directed verdict for Ms. Warren on State Farm's affirmative defense of misrepresentation, and the Eighth Circuit affirmed. *Id.* at 696.

In affirming the directed verdict, the Eighth Circuit focused on the lack of evidence supporting State Farm's affirmative defense. Like Cincinnati here, State Farm bore the burden of proving its affirmative defenses related to the Policy exclusions. *Id.* at 699. State Farm was required to show that Ms. Warren's statement was an actual misrepresentation that was both intentional and material. *Id.* In considering the issue, the court repeatedly turned to State Farm's failure to adduce any evidence in support of its affirmative defense. *Id.* at 699-700.[2] The Eighth Circuit held that without any evidence supporting State Farm's affirmative defense, no reasonable jury could find that Ms. Warren made any material misrepresentation in conjunction with her insurance claim. *Id.*

---

[2] "State Farm has failed to offer any evidence suggesting that Warren had any knowledge of the fire's origin, and our review of the trial record yielded none." *Id.* at 699. "State Farm has presented no evidence that, in making the statement, Warren possessed the requisite intention to mislead." *Id.* "State Farm presented no evidence that Warren was served in relation to the 2001 default judgment…." *Id.* "State Farm presented no evidence to show that its resources … would have been different if it had been appraised of the prior fire loss…." *Id.* at 700.

*Second and independently*, Cincinnati adduced no evidence that the government orders were a "law" or "ordinance"—another element of Instruction 21. The only government order admitted into evidence was issued by a public health official, not a legislative body. *See* Ex. B.[3] There was no competent testimony or evidence establishing that this order was a law or ordinance. Other courts have held, as a matter of law, that temporary restrictions placed on businesses like those here are not laws or ordinances under similar policies. *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co*., 506 F. Supp. 3d 360, 379–80 (E.D. Va. 2020)

> [T]he Court concludes that the Executive Orders, which were temporary restrictions that impacted the Plaintiff's business, were not ordinances or laws such as safety regulations or laws passed by a legislative body regulating the construction, use, repair, removal of debris, or physical aspects of the property. Therefore, there is no ordinance or law, from a legislative body, that prohibits the physical use of Plaintiff's covered property. Furthermore, it is clear that the Ordinance or law Exclusion applies to ordinances related to the structural integrity, maintenance, construction, or accessibility due to the property's physical structural state, which existed before. The physical structural integrity of the covered property is not the central issue in this case."

*Id.* The jury would therefore have based its verdict on pure speculation, which is improper because Cincinnati did not offer any evidence that these orders were laws or ordinances. *See Larson by Larson v. Miller*, 76 F.3d 1446, 1452 (8th Cir. 1996) (jury verdict cannot stand when "the record contains no proof beyond speculation to support the verdict").

*Third*, the Acts or Decisions exclusion, based on Instruction 22 and the policy, "does not apply if the acts or decisions were by any person *other than* the plaintiff or beyond the plaintiff's direction or control." (Doc. 239 at 31) (emphasis added). Here, Plaintiff obviously did not issue the government orders; nor, was there any evidence that the orders were within the direction or

---

[3] After trial, a Missouri state court ruled that orders entered restricting business activities by unelected public health officials are unconstitutional. *See* https://missouriindependent.com/2021/11/23/missouri-judge-local-covid-orders. Plaintiff is attempting to locate a copy of the order, but this further supports that the health orders were not "laws" or "ordinances."

8

control of the Plaintiff. These temporary orders were not acts or decisions of a government body made at the request of, or by application of, the Plaintiff. Thus, by the terms of the jury instruction agreed to by Cincinnati, there was no evidence to establish that the orders were qualifying "acts or decisions" under the policy.

To understand this requirement better, consider a classic example like a fire. In such case, the fire would physically damage the property, which may very well result in a subsequent order from the Fire Marshall prohibiting public access to the building for a certain time until it has been repaired or replaced and is rendered safe to enter. No one would dispute that the policy offers coverage under such a circumstance and that the exclusions do not take that coverage away because the order was not issued by or within the direction or control of the insured. The order from the Local Health Official in response to the presence of SARS-CoV-2 is no different. *See* Ex. B (local health order declaring "a disaster had occurred" and "the confirmed outbreak and person-to-person spread of COVID-19" in Johnson County, Kansas). As in the classic fire example, the government orders here did not cause such physical loss or physical damage; they were imposed in order to protect the public from the dangers resulting from the physical presence of SARS-CoV-2.

*Finally*, the order in which the instructions were given likely compounded the confusion to the jury. The erroneous instructions on Cincinnati's policy exclusions preceded the verdict director on Plaintiff's coverage claim. *See* Instructions 21-23 (Doc. 239), pp. 30-32. Thus, the order of instructions required the jurors to first address the question of Cincinnati's exclusions before determining coverage under the policy.

* * *

9

Permitting evidence and argument of the exclusions and instructing the jury on them was not mere "harmless error."[4]  By instructing the jury, the Court implies that there is at least some evidence to support the defenses when there was none.  Moreover, the exclusion arguments became inextricably intertwined with Cincinnati's causation defense to coverage and impossible to separate from the jury's consideration of the coverage question.  Cincinnati referenced its exclusions from the beginning of its trial presentation until the end.  *See* Trial Tr. vol. 1, 41:23–42:1; Trial vol. 3, 626:17–628:12. For these reasons, Cincinnati invited error by insisting that the jury be given these instructions.

**B.  Instruction 20 Should Have Directed the Jury to Give Defined Terms Under the Policy the "Special Meaning" Dictated by the Policy.**

**1.  Procedural history.**

At Cincinnati's insistence, the Court also declined to instruct the jury that certain words have a special meaning under the policy.  Instead, the Court gave the jury a conflicting instruction that "[a]ll words used in an insurance policy are to be read and understood in their plain and ordinary meaning."  (Instruction No. 20, Doc. 239 at 29).  Plaintiff objected to this instruction because the policy provides that words or terms "in quotation marks have a special meaning" under the policy's DEFINITIONS section.  Trial Exhibit 234A (Ex. A) at 15; Doc. 233 at 7.  Plaintiff, thus, proposed that Instruction 20 include the following proviso after "plain and ordinary meaning": "unless the Policy directs you to apply a special meaning to specified words."  Doc. 233 at 7.  The proposed proviso was accurate and not confusing.  Most importantly, it was necessary to make Instruction 20 legally correct under the terms of the policy.

---

[4] Harmless errors are those that do not affect the substantial rights of the parties.  *Keil v. Lopez*, 862 F.3d 685, 705 (8th Cir. 2017).  Error "affects a party's substantive rights when it is prejudicial, which means that there must be a reasonably probability that the error affected the outcome of the proceeding."  *Id.* (cleaned up).

10

## 2. Instruction 20 was legally inaccurate because it conflicted with the policy.

Conflicting instructions make it impossible for an appellate court to tell which of them the jury followed, "and such an error calls for a reversal." *J.C. Carlile Corp. v. Farmers Liquid Fertilizer, Inc.*, 346 F.2d 91, 94 (8th Cir. 1965) (applying Arkansas law). The fundamental questions the jury was asked to decide in this case were:

- whether the SARS-CoV-2 virus caused a "loss" to the Plaintiff;
- whether one of the exclusions caused that "loss"; and
- whether Plaintiff suffered a financial loss of business income due to the suspension of its operations caused by a "loss" to the Plaintiff.

For both property coverage and the exclusions, "loss" was a defined term, meaning *only* accidental physical loss or accidental physical damage could trigger property coverage or the exclusion. The policy thus stated Cincinnati "will not pay" for any accidental physical loss or accidental physical damage caused by an excluded occurrence. Trial Ex. 234A (Ex. A) at 49 ("We will not pay for 'loss' caused directly or indirectly by … [o]rdinance or [l]aw …"), 52-54. But, once property damage or loss was established, Cincinnati affirmatively agreed that it "will pay for the actual loss of 'Business Income'…" *See id.* at 125. Loss was not a defined term for purposes of the "loss of Business Income;" thus, it plainly referenced financial loss.

Cincinnati never pointed to any provision in the policy stating it "will not pay" for *financial* losses of Business Income caused by a law, ordinance, or act or decision of a government body. By instructing the jury that "all words used in an insurance policy" bear their plain and ordinary meaning, however, the Court authorized the jury to ignore that the policy itself uses the word loss with two different meanings—physical loss or physical damage when discussing the exclusions and financial loss when discussing coverage for business income. Such confusion was exacerbated by Instruction 20's failure to make note of this distinction.

11

In *Goff v. Carpenter*, No. CIV. 06-2023, 2007 WL 1321798, at *1 (W.D. Ark. May 4, 2007), the district court addressed the issue of misleading instructions in considering the Plaintiff's motion for new trial. Goff argued that Instruction 10a was "inconsistent with the overall body of instructions and in particular with Instruction 10 to such an extent that it tends to cause confusion and renders the instructions as a whole misleading." *Id.* at *1. In examining the instruction, the district court agreed with Goff that Instruction 10a had the potential to create confusion in the minds of the jurors and determined that such confusion was likely. *Id.* at *3. Because of the likelihood of such confusion, the district court could not conclude that such error was harmless and ordered a new trial. *Id.* at *4-5.

Here, by not directing the jury to the defined terms in the policy, the instructions added to the confusion created by submission of the instructions related to the exclusion, which Cincinnati exploited in conflating these requirements during closing arguments.[5] *See supra* Section II. The jury's interpretation of loss for purpose of the exclusions likely included Plaintiff's "loss of use" and "financial loss." Indeed, that is what Cincinnati repeatedly argued during closing arguments.[6] Instruction 20 exacerbated that problem, and, in combination with the erroneous instructions given

---

[5] The confusion caused by Instruction 20 is not cured by Instruction No. 19, which instructed the jury on Court's construction of the term "direct physical loss or physical damage." Instruction No. 19 never referenced what it was defining, i.e., the special term, "loss." Instead, Instruction No. 19 provided the jury a definition of a definition by defining "accidental physical loss or accidental physical damage."

[6] Closing arguments by Cincinnati: "They're essentially asserting a *financial loss*. The government issued orders, and it cost us money." Trial Tr. vol. 3, 608:12-13 at (emphasis added). "Mr. Nelson admitted *this is all because of the orders*…. And those orders, I think the testimony is, *affected the use of the building*." *Id.* at 627:24-628:4 (emphasis added). "The orders caused the *financial loss* that K.C. Hopps is claiming…." *Id.* at 628:10–11 (emphasis added). "So if you reach this point, *we're dealing with acts or decisions because we're admittedly dealing with what they have said is the cause of their financial loss*." *Id.* at 630:25-631:2 (emphasis added). "They say it's about the orders. *The orders caused their financial loss*." *Id.* at 632:3-4 (emphasis added).

12

above, rendered the instructions, as a whole, misleading.  The error can only be remedied by grant of a new trial.

## C.     Cincinnati Also Invited Error by Refusing to Agree to a Contributing Cause Instruction in the Verdict Director and Damages Instructions.

### 1.     Procedural history.

Prior to the jury instruction conference, Cincinnati requested that the Court include a causation instruction for lost business income in the verdict director and its converse.  (*See* Doc. 232 at 3; Trial Tr. vol. 2, 494:25-495:8).  The Court included such a paragraph for the first time in the instructions it provided prior to the jury instruction conference.  Plaintiff proposed modifying that instruction that included contributing-cause language based on the controlling proximate-cause standard when there are multiple alleged causes of damage at trial.  (*See* Doc. 233 at 3-4) (proposing the following language to the verdict director "Third, the plaintiff suffered actual loss of business income due to the necessary slowdown or cessation of the plaintiff's business activities during a period of restoration that was caused by ***or contributed to cause by*** direct physical loss or physical damage to the plaintiff's properties.") (emphasis added); *id.* at 2 (proposing the same language for the damages instruction).  At the jury instruction conference, the Court declined to adopt the contributing-cause language, reasoning that the policy required a *direct* loss and distinguishing Plaintiffs' cases as involving personal injury claims, not policy coverage claims. Trial Tr. vol. 3, 565:25-566:17.; (Doc. 239 at 30).[7]

---

[7] Notably, Plaintiff did cite to another court's legal ruling in a COVID-19 business-interruption case, in which that Court held that the proximate-cause standard applied in an insurance coverage dispute when the policy uses "the adjective 'direct' in the term 'direct physical loss'").  *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F. Supp. 3d 729, 740 (N.D. Ill. 2021), motion to certify appeal denied, No. 20 C 02005, 2021 WL 2433666 (N.D. Ill. June 15, 2021).  (Doc. 233 at 2).

13

## 2. Failing to include the contributing-cause language was error invited by Cincinnati.

The Court's reasons for not including the contributing-cause language conflict with settled law.

*First*, use of the word "direct" in conjunction with causation actually supports applying the proximate-cause standard incorporated into the contributing-cause instruction, rather than the sole cause standard successfully advocated by Cincinnati. In the cases cited by Plaintiff, the term direct was present even when a contributing-cause instruction was required. "In Missouri, for multiple causes of damages, the 'direct result' jury instruction must be changed to '*directly* caused or *directly* contributed to cause' in both the liability and damages instructions." *Lockhart v. United States*, 834 F.3d 952, 956 (8th Cir. 2016) (emphasis added) (citing *Carlson v. K-Mart Corp.*, 979 S.W.2d 145 (Mo. banc. 1998). There is, therefore, nothing inconsistent with including the contributing-cause language in conjunction with the word direct.

*Second*, this is true even outside of the context of a negligence cause of action or personal-injury case, as contemplated by MAI 19.01. *See* Mo. Approved Jury Instr. (Civil) 19.01 (8th ed) ("Third, such negligence directly caused or directly contributed to cause damage to plaintiff.") Missouri courts have applied this proximate-cause standard even when construing the causation requirements of an insurance policy: the term "'direct' as used in *an insurance policy* relates to causal connection and is to be interpreted as the immediate or proximate cause as distinguished from the remote cause." *John Drennon & Sons Co. v. New Hampshire Ins. Co*., 637 S.W.2d 339, 341 (Mo. Ct. App. 1982) (emphasis added); *see also Brownstein v. Rhomberg-Haglin & Assocs., Inc*., 824 S.W.2d 13, 15 (Mo. banc 1992) (citing *John Drennon & Sons* favorably for the maxim that direct "has been described as a synonym for 'proximate.'"). "The product of two or more

14

concurrent and contributing causes is the direct result of each, although neither is the sole cause." *Id.*

As in a negligence case, a contributing cause is, therefore, a direct cause in a claim for insurance coverage, unless the insurer explicitly contracts around the use of the proximate-cause definition. As another Missouri federal district court held:

> Given that Missouri courts have a strong history of using the proximate cause analysis to determine if a loss is a 'direct loss' and because many other jurisdictions have used the analysis when interpreting the type of policy at issue here, this court concludes that Missouri courts would apply a proximate cause analysis to the facts of this case. This is supported further by the fact that a Missouri court has held "[d]irect is a synonym of proximate." *John Drennon & Sons Co.*, 637 S.W.2d at 341

*Graybar Elec. Co. v. Fed. Ins. Co*., No. 4:06 CV 1275 DDN, 2007 WL 1365327, at *6 (E.D. Mo. May 9, 2007) (cleaned up).

In *Graybar*, there was a question regarding whether a loss due to forgery was covered when the loss was sustained, in the first instance, by a third-party, for which the insured was ultimately required to indemnify. The court held that the insured's loss by indemnification was a "direct" loss based on the proximate-cause standard because "there [was] no exclusionary language providing that third-party claims are not covered." *Id.* at *6. "Missouri law is clear that when determining whether a loss is a direct result of something, absent clear exclusionary language, use of the proximate cause analysis is appropriate." *Id.* As the court noted, "[t]he parties here could have contracted for a clear exclusion for third-party liability; they did not do so. So, any losses that are proximately caused by the forgery are covered." *Id.*

Likewise, in this case, Cincinnati agreed in the policy that

> [w]e will pay for the actual loss of "Business Income" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at "premises" which are described in the Declarations and for which a "Business Income" Limit of

15

Insurance is shown in the Declarations. The "loss" must be caused by or result from a Covered Cause of Loss.

Trial Ex. 245A (Ex. A) at 125. Cincinnati did not contract around the proximate-cause standard. The suspension of operations need only "be caused by direct 'loss' to property." *Id.* The Policy did not state that this direct loss to property needed to be the *sole* and *only* cause of the Business Income loss. Nor did it anywhere exclude coverage if there were other contributing causes to the suspension of business operations—such as the government orders.[8] Thus, under the proximate-cause standard, Plaintiff was entitled to its total loss of business income—notwithstanding the effect of the orders—so long as the physical loss or damage suffered by Plaintiff due to SARS-CoV-2 was a contributing cause of the suspension of business operations. Missouri has long recognized that when there are multiple, potential causes at issue in the case, omitting the "contributing" cause language is confusing and prejudicial. *Carlson*, 979 S.W.2d at 148 (reversing).[9]

Consequently, omitting the contributing-cause language in the verdict director and damages instructions was contrary to law and prejudicial to a fair verdict.

\* \* \*

---

[8] Notably, the Business Income coverage does contain *other* exclusions not applicable here. *See, e.g.,* Trial Ex. 234A (Ex. A) at 5192 ("Coverage for 'Business Income' does not apply when a 'suspension' of 'operations' is caused by destruction or corruption of 'electronic data', or any 'loss' to 'electronic data,' except as provided…."). Thus, a reasonable policyholder could rely on the *absence* of an exclusion as implying that the policy contained no implicit exclusion.

[9] Kansas law is in accord with these authorities. As interpreted by the Court of Appeals for the Tenth Circuit, "[i]t is well settled that the words 'direct cause,' as used in insurance policies, ordinarily are synonymous in legal intendment with the words 'proximate cause.'" *Dubuque Fire & Marine Ins. Co. v. Caylor*, 249 F.2d 162, 164 (10th Cir. 1957) (applying Kansas law). In *Dubuque*, the Tenth Circuit concluded that the covered event was a "contributing or concurrent cause," *id.*, justifying affirmance of the judgment for the insured. Thus, there is no conflict of law.

Each of these instructional errors are independently sufficient to grant a new trial but taken together they are especially prejudicial. They all relate to causation of Plaintiffs' clear loss of Business Income—a central element of the trial. Even if each one was not independently sufficient to warrant a new trial, collectively the instructions, taken as a whole, did not fairly and adequately represent the evidence and law. *Blackorby v. BNSF Rwy. Co.*, 849 F.3d 716, 720 (8th Cir. 2017). This is particularly true when Cincinnati's closing arguments are analyzed, as done below because it is clear Cincinnati manipulated these errors to mislead the jury.

## II. CINCINNATI IMPROPERLY URGED THE JURY TO FIND THE EXCLUSIONS APPLICABLE EVEN IF THEY DID NOT CAUSE *PHYSICAL* LOSS OR DAMAGE.

The Court need look no further than Cincinnati's closing arguments to conclude that the he instructional errors described above undoubtedly affected the verdict. Cincinnati focused heavily on the cause of Plaintiff's suspension of its business operations—whether due to SARS-CoV-2 or the government orders—but the required contributing-cause instruction discussed above would have neutered those arguments. Most egregiously, however, Cincinnati's manipulated Instruction 21 related to the Ordinance or Law exclusion in a manner that was inaccurate and misleading. Cincinnati conflated physical and financial loss, successfully urging the jury to apply the exclusion if the government orders contributed, at all, to Plaintiff's financial losses. Given its overtly improper and unlawful arguments, the verdict must now be vacated and a new trial conducted with corrected instructions given.

### A. Cincinnati Conflated Physical and Financial Loss To Nullify the Physical Loss Requirement of the Exclusions.

As noted above, an excluded occurrence must cause physical loss or physical damage because the exclusion only applies to a "loss" as that term is defined by the Policy. *See infra* Section I. In contrast, under the Business Income coverage form, Plaintiff was entitled to its

17

"actual loss of business income due to the necessary suspension of the plaintiff's operations during a period of restoration that was caused by direct physical loss or physical damage to the plaintiff's properties." Trial Ex. 245A (Ex. A) at 125. For purposes of Business Income, the term loss is not a defined term; in context, it plainly means financial loss. *Nothing in that provision states that a financial loss of business income will be excluded* because an ordinance or law or act or decision contributes, directly or indirectly, to that financial loss. But, relying on these exclusions and the Court's related instructions, that is *precisely* what Cincinnati improperly argued.

```
19        It's telling you that if that physical loss or
20   damage, if you find it -- and I'd like to think I persuaded
21   you that you shouldn't; but if you do, that if it was caused
22   directly or indirectly by ordinance or law regulating the use
23   of any building or structure.  Let's stop and talk about that.
24        Mr. Nelson admitted this is all because of the
25   orders.  They did everything the government told them to do
                              627
```

```
 1   and then as they reopened in stair steps, what the government
 2   allowed them to do based on the orders.  Okay?  And those
 3   orders, I think the testimony is, affected the use of the
 4   building.  That's what they're saying.  We couldn't have as
 5   many people in there as we wanted to.  Okay?
 6        And this applies regardless of any other cause or
 7   event that contributes at the same time or in a sequence to
 8   the loss.  Let's talk about that for a minute.  These orders
 9   are admitted to have been the driver here.  Make no mistake
10   about that.  The orders caused the financial loss that K.C.
11   Hopps is claiming, not something physical that happened in any
12   of its restaurants, and I told you how we know that.
```

Trial Tr. vol. 3, 627-628.  As the quotation above shows, Cincinnati clearly detailed evidence that

the government "orders caused the *financial* loss that K.C. Hopp's is claiming, not something

physical that happened in any of its restaurants[.]"  Trial Tr. vol. 3, 628:10-12 (emphasis added)).

Yet, it then urged the jury to apply the exclusions based on those orders.

That was not an innocent or isolated error; rather, it was instead an intentional effort to

conflate physical and financial losses under Instruction No. 21 so Cincinnati could bootstrap the

19

anti-concurrent causation language from that instruction into its *financial* loss arguments. Cincinnati's counsel expressly told the jury that if the orders even contributed to the *financial* losses at all they were a concurrent cause of "loss" under the Ordinance or Law exclusion that precluded coverage:

```
 2          You might hear an argument -- and this is my last
 3    chance to talk, so I'm going to take my swing.  You might hear
 4    an argument that it wasn't the orders because the pandemic
 5    caused the orders.  Well, let's just run with that for a
 6    minute.
 7          Any other cause that contributes in any sequence to
 8    the loss.  So if, for argument's sake, the pandemic -- I'm not
 9    going to, you know, tilt at windmills here.  I'm the common
10    sense guy.
11          So we've got these orders that are driven by the
12    pandemic experience from local governments principally.  And
13    if they were caused by the virus, and I think, you know,
14    you're probably going to think that they are, that those
15    orders are still something that in sequence or concurrently
16    caused the loss.  It's fundamentally admitted by K.C. Hopps.
17          I don't know how to make it any more plain than the
18    testimony that I showed you from Mr. Nelson.
19          So the fact of those orders and the fact that
20    they're even part of the cause of their claimed financial loss
21    means that this exclusion applies.  And by the way, when
22    you're looking at it, it's in Exhibit 234, don't forget this
23    word "indirectly" as well.
```

Trial Tr. vol. 3, 629. Cincinnati, thus, plainly invited the jury to misapply the exclusion by replacing physical loss with financial loss and insisting that if the "orders [are] even part of the cause of their claimed financial loss [that] means that this exclusion applies." *Id.*[10]

_____

[10] Plaintiff timely objected to any argument by Cincinnati that the shutdown orders could trigger the exclusions. Trial Tr. vol. 3, 571:11-572:7.

20

This prejudiced Plaintiff's right to a fair trial in two ways.

*First*, the argument was plainly improper as Plaintiff's financial losses were legally insufficient to trigger application of the exclusions, as noted above. Cincinnati had the burden to show the excluded occurrences caused a physical loss or physical damage due to SARS-CoV-2, meaning the physical contamination or alteration of the property. Take the Ordinance or Law exclusion, which reads as follows in the policy: "We will not pay for [accidental physical loss or accidental physical damage] caused directly or indirectly by … the enforcement of or compliance with any ordinance or law: Regulating the construction, use or repair of any building or structure." Trial Ex. 234A (Ex. A) at 17 (replacing "loss" with defined meaning). It absolutely does *not* read that Cincinnati will *not* pay for financial losses caused directly or indirectly by such legal compliance; but that was Cincinnati's argument to the jury.

*Second*, it is all but certain that by conflating the physical and financial loss requirements, Cincinnati led the jury to an improper verdict. Cincinnati emphasized the anti-concurrent causation language in the Ordinance or Law exclusion and instruction. Trial Tr. vol. 3, 629:11-16 ("So we've got those orders that are driven by the pandemic experience from local governments principally. And if they were caused by the virus, and I think, you know, you're probably going to think that they are, that those orders are still something that in sequence or concurrently caused the loss."). It equally emphasized that the Ordinance or Law exclusion applied to both direct *and indirect* losses. *See* Trial Tr. vol. 3, 629:21-23 ("And by the way, when you're looking at it, it's in Exhibit 234, don't forget this word 'indirectly' as well."). Cincinnati then conflated financial and physical loss under Instruction 21 so that the jury believed any indirect financial loss caused by the orders was excluded under the policy. It did so for the obvious reason that there was *no* language in the verdict director or the underlying policy that excluded Plaintiffs' business income

losses if those losses were indirectly or concurrently caused by a law or ordinance that did *not* cause physical loss or physical damage.  (*See* Doc. 239 at 33).

Moreover, the absence of a contributing-cause instruction in the verdict director only exacerbated the jury's likely confusion and afforded Cincinnati greater latitude to misrepresent Instruction 21 to the jury.  Likewise, because Instruction 20 did not point the jury to the policy definitions, Cincinnati was able to avoid the fact that the word loss carried a different meaning with respect to the exclusions (when it was in quotation marks in the policy) than with respect to the business income coverage.

Cincinnati's misrepresentations reached a crescendo of falsehood at the end of Cincinnati's closing argument:  "So the fact of ***those orders*** and the fact that they're ***even part of the cause of their claimed financial loss means that this exclusion applies.***"  Trial Tr. vol. 3, 629:19-21. Cincinnati could not have made that argument *without* the erroneous submission of Instruction 21. Absent a clear instruction, which was not given, the jury cannot have been expected to sort these legalistic distinctions out on its own.  And Cincinnati should not have been given latitude to make a legally inaccurate argument to the jury over Plaintiff's objections at trial.

### B.    Based on Cincinnati's Misuse of Instruction 21, the Verdict Was Against the Weight of the Evidence.

"[I]t is the duty of the judge to set aside the verdict and grant a new trial, if he is of opinion that the verdict is against the clear weight of the evidence… or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."  *Aetna*, 122 F.2d at 352-53.  In other words, a new trial may be granted even if a scintilla of evidence supports the verdict and even when granting a directed verdict would be inappropriate. Based on Cincinnati's inappropriate arguments and the instructional errors, the verdict here was

22

against the clear weight of the evidence, as shown by the fact that Plaintiff met the elements of the verdict director in large part based on the admission of Cincinnati's own witnesses.

*First*, Plaintiff submitted overwhelming evidence at trial supporting that its properties were physically contaminated or altered by the SARS-CoV-2 virus. Only one expert, Dr. Goodman, opined on the presence of the virus at Plaintiff's properties. (*See* Doc. 256-1). None of Cincinnati's experts disagreed with his conclusion that the virus was highly likely to be present. Nor was there anything rebutting Mr. Nelson's testimony that between 50 and 100 of Plaintiff's employees tested positive for COVID-19. Trial Tr. vol. 1, 118:1-7. It is beyond peradventure that the virus was, at least present on some of Plaintiff's properties as some period from March 2020 to March 2021.

*Second*, the requirement of physical loss or physical damage to Plaintiff's property was met by establishing physical contamination or alteration. (Doc. 239 at 28). All of the experts agreed, including Cincinnati's, that SARS-CoV-2 could contaminate both the air inside a restaurant or a bar and any surface that viral particles come in contact with and that viral particles can remain viable on surfaces for days. Trial Tr. vol. 2, 441, 439:14-440:25 (Thomann), 396-97, 393:15-394:8 (Armitage). Dr. Thomann testified that while the coronavirus is present in a building, it has the potential to be a threat to people entering the premises and could result in death, which is why "[w]e tend not to want to take chances." Trial Tr. vol. 2, 441:3. Dr. Thomann's opinions expressly found an increased risk of contamination through the release of respiratory droplets in eating and drinking establishments because masking is not possible when people are eating and drinking. Trial Tr. vol 2, 465:14-467:18. Dr. Thomann even expressed concern about a Kansas City bar he visited the night before his testimony and how it was likely being contaminated even as he entered the building. Trial Tr. vol. 2, 466:5-10.

23

Cincinnati's other expert, Dr. Armitage, testified that, "throughout the pandemic, we should be cautious about all modes of transmission." Trial Tr. vol. 2, 393:13-14. When asked if crowded bars with people talking loudly were a "nightmare scenario" for the risk of contamination, Dr. Armitage agreed, saying, "Crowded bars with poor ventilation with people talking loudly is probably a higher-risk situation than maybe a Walmart, which is a – maybe has ventilation, but they're all a risk." Trial Tr. vol. 2, 397:11-14. Even if the jury credited Cincinnati's argument that the virus could be easily cleaned, that would only shorten the time period of contamination or alteration, not eliminate it.

*Third*, as evidenced by the fact that Cincinnati had to lie to the jury about the requirements of Instruction 21, conflating financial and physical loss for purposes of the exclusion, Plaintiff proved the causation requirements of its business income claim according to the verdict director. If Cincinnati could have rebutted the causation element of the verdict director, it would not have needed to try to improperly bootstrap its arguments with the more liberal anti-concurrent causation language of the Ordinance or Law exclusion. Furthermore, if the verdict director had included the contributing-cause language proposed by Plaintiff, Plaintiff's entitlement to coverage would be even more obvious to the jury. There was no dispute that the government orders were the *result* of SARS-CoV-2, not the other way around.

In sum, there cannot be any confidence that the verdict is the product of the evidence and a correct application of the law given: the instructional errors; Cincinnati's open misuse of the instructions; and, the weight of the evidence presented by Plaintiff all point to a miscarriage of justice. Plaintiff thus respectfully deserves the right to a new trial.

24

III.    THE COURT SHOULD NOT HAVE EXCLUDED EVIDENCE OF THE VIRUS EXCLUSION.

The Court incorrectly granted Cincinnati's motion in limine excluding evidence related to the ISO virus exclusion, which Cincinnati uses in some of its policies issued outside Missouri.  AS a proffer, Plaintiff placed that evidence into the record, including a copy of the virus exclusion available to Cincinnati along with the fact that Cincinnati uses that exclusion in similar policies in some states outside Missouri.  *See* Trial Tr. vol. 3, 491:22-492:14; Trial Ex. 115, attached as Exhibit C; Henn Tr. attached as Exhibit D at 24-25.  The virus exclusion expressly covers "all coverage under all forms and endorsements … including but not limited to forms or endorsements that cover *property* damage to buildings or personal property[.]"  Ex. C at PDF pg. 6 (emphasis added).  Because the exclusion assumes a virus can cause physical property damage, this evidence contradicts Cincinnati's argument at trial that the SARS-CoV-2 virus does not meet the physicality requirement.

Even more relevant, internal communications reflect that Cincinnati confidentially believed that direct physical loss does occur when the virus is present on the property, at least to some degree.  *See id.* at page 25 ("Once someone who is a carrier is on our premises, then I think, and Tore agreed, that constitutes some type of property damage and Tore thought we would at least pay for clean-up/disinfectant costs (e.g., a student is diagnosed with the disease and we pay to disinfect dorm room)").  This is not extrinsic evidence but an admission that directly contradicts Cincinnati's arguments at trial that the presence of the virus lacks the physicality necessary to constitute physical contamination.  *See* Trial Tr. vol. 3, 461-62.  Thus, it was directly relevant to the issues of fact that the jury was tasked with deciding and should not have been excluded.

25

## IV.    THE COURT SHOULD HAVE STRUCK THE JURY FOREPERSON.

While the "courts presume that a prospective juror is impartial," a party seeking to strike a venire member for cause need only "show that the prospective juror is unable to lay aside his or her impressions or opinions and render a verdict based on the evidence presented in court." *Allen v. Brown Clinic, P.L.L.P.*, 531 F.3d 568, 572 (8th Cir. 2008) (quoting *Moran v. Clarke*, 443 F.3d 646, 650 (8th Cir.2006)). A juror's personal experience that is "connected to an opinion or influence which results in an inability to render an objective verdict" is a basis for finding impartiality. 58 Am. Jur. Proof of Facts 3d 395 (Originally published in 2000). "It does not require much—nor should it require much—to tip the balance in favor of disqualification. If any such disqualifying influence is shown to exist, it is sufficient." *Id.*

Venireperson No. 2 was an accountant. Trial Tr. voir dire, 78:19–21. During voir dire, she candidly admitted that she would "probably have some bias" if she heard testimony from any expert witness that conflicted with her accounting experience; she also admitted that it "may be difficult" to put her own accounting experiences aside:

> **MR. STUEVE**: Okay. You're going to hear expert testimony from both sides about how you calculate lost business income under this particular policy. Would you be able to put aside your specific accounting background and listen to the testimony from the accountants and base your decision based on their testimony and the insurance policy?
>
> **VENIREMAN 2:** I guess I'd -- if I thought they were not following accounting rules, I'd probably have some bias against that. But as long as -- I mean, that's probably it.
>
> **MR. STUEVE**: No. That's fair enough. I appreciate your candor. You could see, because of your background, that it may be difficult for you to put that aside if you heard testimony that was contrary to your experience.
>
> **VENIREMAN 2**: Yes.

26

Trial Tr. voir dire, 79:17–80:5.  Based on her candid admissions, Plaintiff moved to strike Juror

No. 2 on the grounds that:

> she would have difficulty if the accountants did not follow the rules and said that
> she would have some, quote, bias if they did not follow the accounting rules.  So,
> you know, we think this is an indication of someone who's bringing in an expertise
> that's particularly relevant to this case and indicating that she would have difficulty
> putting it aside if there was something that she saw was wrong is our concern.

*Id.* at 189:11-15.  The Court declined to strike Juror No. 2; she ultimately sat on the jury (*id.* at

198:8-9); *and*, she was elected foreperson.  (*See* Doc. 242).

At trial, Plaintiff's damages—an element of its liability claim under Instruction No. 23—

depended almost entirely on the testimony of Kevin Grudzien, its expert accountant.  Mr. Grudzien

was vigorously cross examined by defense counsel.  Trial Tr. vol. 2, 295-346.  It is impossible to

know if any of the accounting methodologies employed by Mr. Grudzien conflicted with the

foreperson's personal accounting experiences, which she admitted would be difficult for her to set

aside and probably bias her against the party offering the witness.

By admitting she would "probably be biased" and that it would be difficult for her to set

aside her own experiences, the foreperson admitted that she could not decide the case based solely

on the evidence presented at trial.  The Eighth Circuit has found impermissible bias under similar

circumstances.  For example, in *United States v. Sithithongtham*, 192 F.3d 1119, 1121 (8th Cir.

1999), the Circuit held that a juror was biased when he or she could only state they would

"probably" be fair and impartial: as the Hon. Richard S. Arnold wrote, "'Probably' is not good

enough."  *Id.*[11]  Here, the foreperson was candid that she would "probably have some bias."  That

admission was freely given, not based on any leading question, and the juror was not subject to

---

[11] Ultimately, the Eighth Circuit held that while failing to strike the juror for cause was an
abuse of discretion, the error was harmless because the defendant used a preemptory challenge on the
juror.  In this case, Plaintiff did not use a preemptory challenge on Venireperson No. 2.

27

any further questioning that might be characterized as rehabilitation. "[T]he rule that a juror may not be found to be impartial unless he can provide assurances that he is able to lay aside his opinion and render a verdict based solely on the evidence is a federal constitutional requirement," and cannot merely be swept away. *Oswald v. Bertrand*, 249 F. Supp. 2d 1078, 1105 (E.D. Wis. 2003), aff'd, 374 F.3d 475 (7th Cir. 2004). Given her candid admission, Plaintiff is entitled to a new trial with a jury whose impartiality is unquestioned.

## **CONCLUSION**

For these reasons, the Court should vacate the judgment and order a new trial. In addition, for the reasons explained herein and in Plaintiffs' renewed motion for judgment as a matter of law, the Court should direct a verdict in Plaintiff's favor on the exclusions based on the absence of evidence.

Dated: November 24, 2021                    Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

*s/ Patrick J. Stueve*
Patrick J. Stueve, MO #37682
Bradley T. Wilders, MO #60444
Abby E. McClellan, MO Bar # 66069
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:      816-714-7100
Facsimile:       816-714-7101
Email:            stueve@stuevesiegel.com
Email:            wilders@stuevesiegel.com

**MILLER SCHIRGER LLC**
John J. Schirger, MO # 60583
Matthew W. Lytle, MO #59145
Joseph M. Feierabend, MO #62563
4520 Main Street, Suite 1570
Kansas City, MO 64111

28

Telephone:     (816) 561-6500
Facsimile:     (816) 561-6501
Email: jschirger@millerschirger.com
Email: mlytle@millerschirger.com
Email: jfeierabend@millerschirger.com

**LANGDON & EMISON LLC**

J. Kent Emison, MO #29721
911 Main Street
PO Box 220
Lexington, Missouri 64067
Telephone:     (660) 259-6175
Facsimile:     (660) 259-4571
Email:          kent@lelaw.com

**SHAFFER LOMBARDO SHURIN, P.C.**
Richard F. Lombardo, MO# 29748
2001 Wyandotte Street
Kansas City, MO 64108
Telephone:     816-931-0500
Facsimile:     816-931-5775
Email:          rlombardo@sls-law.com

*Attorneys for Plaintiff*